2005 ME 88

**Anthony ULIANO et al.**

v.

**BOARD OF ENVIRONMENTAL
PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 20, 2004.
Decided: July 7, 2005.

Edmond J. Bearor (orally), Timothy A. Pease, Rudman & Winchell, Bangor, for plaintiffs.

G. Steven Rowe, Atty. Gen., Margaret A. Bensinger, Asst. Atty. Gen. (orally), Augusta, for defendants.

James & Phoebe Boyer, Salisbury Cove, David Dunton, Bar Harbor, Franklin & Sherrie Epstein, Brookline, MA, Robert & Judith Grossart, Salisbury Cove, Lois Hager, Bloomfield, CT, David & Mary Opdyke, Salisbury Cove, Brad & Lynn Thompson, Galveston, TX, Intervenors.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Anthony and Erin Uliano appeal from a judgment of the Superior Court (Hancock County, *Mead, J.*) affirming the Board of Environmental Protection's order denying their application for a permit to build a pier pursuant to the Natural Resources Protection Act (NRPA, the Act), 38 M.R.S.A. §§ 480–A to 480–AA (2001 & Supp.2004). The Ulianos raise several challenges to the Board's findings and conclusions. We conclude that the Board misapplied its Wetland Protection Rules and failed to issue findings that permit effective appellate review. Accordingly, we vacate the judgment and remand this matter for additional proceedings by the Board.

## I. BACKGROUND

[¶ 2] The Ulianos own waterfront property in Salsbury Cove on Eastern Bay in Bar Harbor. Their NRPA permit application seeks approval to construct a 95′ × 6′ private, recreational pier, with an attached 50′ seasonal aluminum ramp and a 16′ × 20′ seasonal wooden float. The Ulianos need a permit because building the pier will constitute construction of a permanent structure in, on, or over coastal wetlands, which are a protected natural resource. 38 M.R.S.A. §§ 480–B(2), (8), 480–C (2001 & Supp.2004).

[¶ 3] The Department of Environmental Protection received numerous letters in opposition to the Ulianos' permit application, many of which requested a public hearing before the full Board.[1] The letters expressed concern that the pier will threaten scenic and recreational uses of Salsbury Cove, and harm marine and wildlife habitats. The Board declined to assume jurisdiction over the application, and the Department held a public meeting to receive comment on the proposed pier. The Department ultimately approved the Ulianos' permit application.

[¶ 4] Abutters to the Ulianos' property appealed the Department's decision to the Board pursuant to 38 M.R.S.A. § 341–D(4) (2001). The Board reversed the Department's decision and denied the permit application, based on its conclusions that (1) the use of a dinghy in conjunction with a mooring is a practicable alternative to the pier, 2 C.M.R. 06 096 310–4, 310–7 §§ 5(A), 9(A) (2002); (2) the cumulative impact of the pier, together with the potential that other piers could follow, poses a substantial threat to the scenic and aesthetic val-

---

1. Generally, the Department has jurisdiction over NRPA permit decisions. *See, e.g.,* 38 M.R.S.A. §§ 480–C, 480–D (2001 & Supp. 2004). But, "[a]ny person may request that the Board assume jurisdiction over an application by submitting the request to the Department in writing no later than 20 days after the application is accepted as complete for processing." 2 C.M.R. 06 096 002–8 § 17(A) (2003). The Board assumes jurisdiction over applications that "(1) involve[] a policy, rule or law that the Board has not previously interpreted; (2) involve[] important policy questions that the Board has not resolved; (3) involve[] important policy questions or interpretations of a rule or law that require reexamination; or (4)[are] of substantial public interest." 2 C.M.R. 06 096 002–8 to 002–9 § 17(C) (2003).

ues of Eastern Bay and Salsbury Cove, 2 C.M.R. 06 096 310–5 § 5(D)(1)(d) (2002); and (3) the pier will unreasonably interfere with existing scenic and aesthetic uses in a manner inconsistent with existing structures and development, 38 M.R.S.A. § 480–D(1) (2001).

[¶ 5] The Ulianos appealed the Board's decision to the Superior Court pursuant to M.R. Civ. P. 80C, and the Superior Court affirmed the Board's order. This appeal followed.

## II. DISCUSSION

[¶ 6] "When the Superior Court acts as an intermediate appellate court, reviewing a decision of a state or local administrative agency, we review directly the decision of the administrative agency." *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 11, 832 A.2d 765, 768. Accordingly, we review the Board's decision for errors of law, unsustainable exercises of discretion, or findings not supported by substantial evidence in the record. *Id.* ¶ 11, 832 A.2d at 768–69; *see also* 5 M.R.S.A. § 11008 (2002).

## A. Whether the Board's Findings Are Contrary to the Evidence and Arbitrary and Capricious

[¶ 7] Section 480–D of NRPA sets forth nine standards that an applicant must meet to receive a permit for activities that are regulated by the Act.[2] 38 M.R.S.A.

§ 480–D (2001 & Supp.2004). "[T]o ensure that the standards set forth in [s]ection 480–D ... are met by applicants proposing regulated activities in, on, over or adjacent to a wetland or water body," the Board promulgated the Wetland Protection Rules. 2 C.M.R. 06 096 310–2 § 1 (2002). The Wetland Protection Rules set forth a framework of factors, including practicable alternatives and cumulative impact standards, to be considered by the Board and the Department when conducting section 480–D analyses.[3] 2 C.M.R. 06 096 310 (2002).

[¶ 8] The Ulianos challenge the Board's findings and conclusions pertaining to its (1) practicable alternatives analysis; (2) cumulative impact analysis; and (3) section 480–D(1) analysis. We consider each in turn.

### 1. Practicable Alternatives

[¶ 9] Section 5(A) of the Wetland Protection Rules states that "[n]o activity shall be permitted if there is a practicable alternative to the project that would be less damaging to the environment." 2 C.M.R. 06 096 310–4 § 5(A). "Practicable" is defined as "[a]vailable and feasible considering cost, existing technology and logistics based on the overall purpose of the project." 2 C.M.R. 06 096 310–3 § 3(R) (2002). Section 5(A) further specifies that each permit application "must provide an analy-

---

2. The nine standards that an applicant must meet to receive a permit for activities that are regulated by NRPA relate to (1) existing uses; (2) soil erosion; (3) habitats and fisheries; (4) natural water flow; (5) water quality; (6) flooding; (7) sand supply; (8) natural and recreational features of river segments; and (9) dredging. 38 M.R.S.A. § 480–D (2001 & Supp.2004).

3. The factors set forth in the Wetland Protection Rules that are considered by the Board and the Department when conducting section

480–D analyses include: whether a practicable alternative to the proposed project exists, 2 C.M.R. 06 096 310–4 § 5(A) (2002); whether the amount of wetland to be altered has been kept to the minimum amount necessary, *id.* § 5(B); whether compensation is required, 2 C.M.R. 06 096· 310–4 to 310–5 § 5(C) (2002); and whether the project will have an unreasonable impact on a wetland, which includes the cumulative impact standard, 2 C.M.R. 06 096 310–5 to 310–6 § 5(D) (2002).

sis of alternatives [pursuant to section 9(A)] in order to demonstrate that a practicable alternative does not exist." 2 C.M.R. 06 096 310–4, 310–7 §§ 5(A), 9(A). Determining whether a practicable alternative exists includes:

(1) Utilizing, managing or expanding one or more other sites that would avoid the wetland impact;

(2) Reducing the size, scope, configuration or density of the project as proposed, thereby avoiding or reducing the wetland impact;

(3) Developing alternative project designs, such as cluster development, that avoid or lessen the wetland impact; and

(4) Demonstrating the need, whether public or private, for the proposed alteration.

2 C.M.R. 06 096 310–7 § 9(A).

■ [¶ 10] The purpose of the Ulianos' proposed pier, as stated in their permit application, is to provide access to their boat at all tides. Among other alternatives, the Ulianos considered, but rejected, using a dinghy and a mooring in lieu of a pier.[4]

[¶ 11] The Board found that using a dinghy and a mooring is a practicable alternative to the proposed pier and, thus, the Ulianos did not meet their burden of proving that no practicable alternative exists. The Board did not, however, relate its finding that a practicable alternative exists to its overall determination of whether the relevant section 480–D criteria were satisfied. The Board simply discussed the evidence in the record regarding practicable alternatives and concluded that the Ulianos did not meet their burden of proving that no practicable alternative

to their pier exists. For the reasons that follow, we conclude that the Board erred as a matter of law in undertaking its practicable alternatives analysis in isolation from the statutory permitting standards set forth in section 480–D.

[¶ 12] The Board promulgated the Wetland Protection Rules to ensure that the standards contained in section 480–D are met. 2 C.M.R. 06 096 310–2 § 1. The Board argues that the rules are a part of its overall analysis, and we are persuaded by its argument that an applicant's adherence to the rules is one factor the Board must consider to determine whether the section 480–D criteria are met. This means that section 5(A) of the rules is not an independent criterion, but is only a factor to be considered by the Board, and an applicant's failure to comply with one of the rules may support, but does not compel, a determination that a project's impact on a protected natural resource would be unreasonable.

[¶ 13] The specific standard at issue in this case is described in section 480–D(1), which provides that to obtain a permit for a proposed project an applicant must demonstrate that the project "will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses." 38 M.R.S.A. § 480–D(1). Whether a proposed project's interference with existing uses is reasonable depends on a multiplicity of factors, one of which is the existence of a practicable alternative. A balancing analysis inheres in any reasonableness inquiry. See *Grant's Farm Assocs., Inc. v. Town of Kittery*, 554 A.2d 799, 802 (Me.1989). Therefore, the Board's consideration of practicable alternatives to a proposed project is a factor

---

4. Other alternatives considered by the Ulianos that were rejected by them, and by either the Department or the Board, included using public facilities, installing a temporary, seasonal pier, and constructing a shorter pier.

that should be balanced in its section 480–D(1) analysis.

[¶ 14] The Board might find, for example, that the existence of a practicable alternative does not justify the denial of a proposed project if the degree of interference the project will cause to existing uses is insubstantial. Conversely, the Board might find that the existence of a practicable alternative supports the denial of a project if it finds that the degree of the project's interference with existing uses will be substantial. In the latter case, the Board may conclude that, on balance, the resulting interference with existing uses would be unreasonable because of the existence of a practicable alternative that, if pursued, would enable the applicant to accomplish the project's objectives through alternate means.

[¶ 15] Although we did not expressly adopt such an interpretation of the practicable alternatives rule in our recent discussion of the rule in *Kroeger v. Department of Environmental Protection*, 2005 ME 50, 870 A.2d 566, treating the practicable alternatives rule as a factor to be balanced in the Board's section 480–D(1) analysis is consistent with our application of the rule in that case. In *Kroeger*, we noted that the Department determined that a proposed dock's interference with existing scenic and aesthetic uses would be unreasonable because practicable alternatives to the dock existed. *Id.* ¶ 17, 870 A.2d at 571. The Department discussed its practicable

alternatives findings in terms of the reasonableness of the proposed dock's interference with existing scenic and aesthetic uses. *Id.* Hence, the existence of a practicable alternative to a proposed project supported, but did not compel, the administrative decision to deny the permit pursuant to section 480–D(1). *Id.* ¶ 20, 870 A.2d at 572.

[¶ 16] In contrast with the approach taken in *Kroeger* and described by the Board in its brief to us, the Board's order in this case did not treat the practicable alternatives rule as a factor to be considered in its section 480–D(1) balancing analysis. Rather, the Board concluded that the use of a dinghy and a mooring is a practicable alternative to the proposed pier, and made no effort to factor that finding into its ultimate determination of whether the Ulianos' proposed pier will "unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses." 38 M.R.S.A. § 480–D(1). The practicable alternatives standard was not applied as a factor, but rather as an independent, determinative criterion.

[¶ 17] Accordingly, we conclude that the Board erred as a matter of law in its application of the practicable alternatives standard. On remand, the Board should reconsider its practicable alternatives findings and apply those findings as part of its section 480–D(1) analysis.[5]

---

5. Contrary to the Ulianos' assertion, the practicable alternatives rule does not result in a de facto moratorium on coastal pier construction. The Ulianos allege that the particular characteristics of their shoreline make it infeasible to use a dinghy and a mooring to access their boat. Consequently, the Ulianos argue that allowing the Board to deny their permit application based on a finding that using a dinghy and a mooring is a practicable alternative to their pier would effectively cut off future coastal pier construction because

there would be no circumstances in which a dinghy and a mooring would not constitute a practicable alternative to a pier. The Board concedes, however, that it does not have the authority to impose a moratorium, express or otherwise, on the permitting of piers. If the existence of a practicable alternative is just one factor the Board considers in its overall section 480–D analysis, the fact that a practicable alternative to a proposed pier exists will not necessarily result in the denial of a permit.

## 2. Cumulative Impact

[¶ 18] Section 5(D)(1) of the Wetland Protection Rules states, "[e]ven if a project has no practicable alternative and the applicant has minimized the proposed alteration as much as possible, the application will be denied if the activity will have an unreasonable impact on [a] wetland." 2 C.M.R. 06 096 310–5 § 5(D)(1) (2002). " 'Unreasonable impact' means that one or more of [section 480–D's standards] will not be met." *Id.* In determining whether an activity will have an unreasonable impact, the Department considers, among other things, "[c]umulative effects of frequent minor alterations on [a] wetland." 2 C.M.R. 06 096 310–5 § 5(D)(1)(d).

[¶ 19] The Board found that "the cumulative impact of the [Ulianos'] pier, together with the potential that other piers could follow, poses a substantial threat to the scenic and aesthetic values of Eastern Bay and Salsbury Cove." Citing our decision in *Hannum*, the Ulianos assert that this finding is contrary to the evidence and arbitrary and capricious because the Board's speculation that other piers might follow should their pier be approved cannot serve as a basis for deciding that the cumulative impact standard was not met.[6] *See* 2003 ME 123, ¶ 15 n. 6, 832 A.2d at 770 (holding that "[f]act-finders must rely on evidence, not speculation, in fact-finding").

[¶ 20] The Board concedes that its speculation was improper in light of *Hannum,* which was issued after the Board acted on the Ulianos' permit application. Furthermore, as with the practicable alternatives standard, the Board did not tie its application of its cumulative impact standard to its section 480–D(1) analysis. Therefore, on remand, the Board must issue additional findings regarding the cumulative impact of the Ulianos' pier and incorporate those findings into its section 480–D(1) analysis.

## 3. Section 480–D(1) Findings

[¶ 21] As previously noted, section 480–D(1) provides that in order to obtain a permit to build their pier the Ulianos had to prove that the pier "will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses." 38 M.R.S.A. § 480–D(1). Based upon the evidence in the record and its observations, the Board concluded that the Ulianos' pier will unreasonably interfere with existing scenic and aesthetic uses. The Ulianos argue that this conclusion is contrary to the evidence and arbitrary and capricious.

[¶ 22] The Ulianos had the burden of proving that their pier will comply with section 480–D(1). *See Hannum*, 2003 ME 123, ¶ 12, 832 A.2d at 769. Concomitantly, the Board "had an affirmative obligation to set out in a decision its reasons for the denial of the application and to state its reasons with sufficient specificity to permit understanding and meaningful appellate review." *Id. See also* 1 M.R.S.A. § 407(1) (1989); 5 M.R.S.A. § 9061 (2002).

[¶ 23] The Board based its conclusion that the Ulianos' pier will unreasonably interfere with existing scenic and aesthetic uses on the following findings:

> The record contains photographs, maps and descriptions of the shoreline in the area of the proposed project. Members of the Board also visited the site to assess potential impacts to scenic and aesthetic uses and therefore finds that additional scenic impact analysis of Eastern Bay is not warranted. Based on evidence in the record and observa-

---

6. Though framed as an argument that the Board's finding is contrary to the evidence and arbitrary and capricious, the issue is actually whether the Board erred as a matter of law in basing its cumulative impact finding on speculation that other piers might follow.

-tions during its site visit, the Board finds that ... the character of the area from Parker Point west to Hadley Point would not be maintained were the proposed pier constructed and that the project would unreasonably interfere with existing scenic and aesthetic uses in a manner inconsistent with existing structures and development.

These findings do not permit meaningful appellate review because they merely summarize the evidence considered and state the Board's conclusion. They fail to identify which scenic and aesthetic uses the Board considered, and they fail to explain why the Ulianos' pier would unreasonably interfere with those uses.

[¶ 24] Examples of the types of specific factual findings that are required are found in *Kroeger*. In *Kroeger*, the Department based its decision that the proposed dock would constitute an unreasonable interference with existing scenic and aesthetic uses on the following findings: Somes Sound, the location of the proposed dock, is " 'the only natural fjord on the east coast of the United States' "; "Acadia National Park is located on the opposite side of Somes Sound from the proposed dock"; " 'a light colored, linear structure 17 feet high and extending out into the sound represents a sharp visual contrast to the natural horizontal banding of the shoreline, and would degrade the scenic character of the natural shoreline of the Somes Sound fjord' "; "Somes Sound is used by many boaters to enjoy the beauty of the area"; and launching small boats from the shore or utilizing a nearby public marina were practicable alternatives to the proposed dock. 2005 ME 50, ¶¶ 10, 14, 20, 870 A.2d at 569–72. These findings permitted appellate review of the Department's denial of Kroeger's permit because they established the *uses* the Department considered—the scenic uses of boaters in the Sound and visitors

to nearby Acadia; the significance of the protected natural resource that would be affected—the only natural fjord on the east coast of the United States, *see* 38 M.R.S.A. § 480–A (2001) (explaining that NRPA protects resources that have "great scenic beauty and unique characteristics, [and] unsurpassed recreational, cultural, historical and environmental value of present and future benefit"); and *how* construction of the proposed dock would unreasonably interfere with those uses—detailing how the dock would degrade the Sound's scenic character. *Kroeger*, 2005 ME 50, ¶¶ 10, 14, 870 A.2d at 569–70.

[¶ 25] In contrast with *Kroeger*, the Board's findings in the present case provide little insight as to why the Board denied the Ulianos' permit application. Without adequate findings, we cannot determine whether the evidence supports the Board's findings or whether its findings are arbitrary and capricious. *See Christian Fellowship & Renewal Ctr. v. Town of Limington*, 2001 ME 16, ¶ 15, 769 A.2d 834, 839. Moreover, as discussed above, the Board divorced its practicable alternatives and cumulative impact findings from its section 480–D(1) analysis. Thus, we conclude that the Board's findings are inadequate as a matter of law. On remand, the Board must reconsider the evidence, issue new findings, and undertake a new section 480–D(1) analysis.

B. The Ulianos' Remaining Arguments

[¶ 26] The Ulianos also argue that section 480–D(1)'s scenic and aesthetic uses standard is an unconstitutional delegation of legislative authority, that the cumulative impact and practicable alternatives standards in the Wetland Protection Rules are unconstitutionally vague and exceed the Board's rule-making authority, and that the Board's order deprived them of their

common law right to wharf out. We decline to address these additional arguments because, depending on the nature of the findings and conclusions that the Board makes on remand, they may be rendered moot.

The entry is:

Judgment vacated and remanded to the Superior Court for an order remanding to the Board of Environmental Protection for further proceedings consistent with this opinion.