STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  DOCKET NO. AP-20-12

BARRY MACKAY,                      )
                                   )
          Petitioner,              )
                                   )
     v.                            )    ORDER ON PETITIONER'S M.R. CIV P.
                                   )    80C APPEAL
MAINE DEPARTMENT OF                )
ENVIRONMENTAL                      )                    REC'D CUMB CLERKS OFC
PROTECTION,                        )                    JUL 20 '21 AM 8:30
                                   )
          Respondent.              )

Petitioner Barry MacKay appeals from the Maine Department of Environmental

Protection's decision to issue a permit allowing Port Harbor Holdings I, LLC ("Port

Harbor") to construct an expansion of an existing docking system located on Sebago

Lake in Raymond, Maine. For the following reasons, the Petitioner's appeal is denied.

I.     Factual and Procedural Background

Port Harbor, a commercial marina located on Route 302 on Sebago Lake in

Raymond, Maine, is the recipient of the Maine Department of Environmental Protection

(DEP) permit at issue in this appeal. Petitioner MacKay is an interested party who

owns property at Indian Point Owners Association (IPOA), a collection of parcels

organized as a condominium association that is located near the project under review.

Sebago Lake is a "great pond" under Maine law, and any alteration of a great

pond requires a permit under the National Resources Protection Act (NRPA). (R. 4).

The Port Harbor marina, which is located on Jordan Bay in the northeastern portion of

Sebago Lake, was established by the former landowner prior to the enactment of the

NRPA. (Pet'r's Br. 3.) It previously consisted of 67 boat slips supported by 12

permanent pilings. (R. 4). In 2018, Port Harbor installed an L-shaped dock that

provided 10 additional boat slips without applying for a permit from the DEP. (R. 8.)

1

On December 20, 2019, Port Harbor submitted an NRPA permit application to expand its existing marina to add additional slips. (R. 4.) The expansion proposes to install 12 permanent pilings to support a seasonal floating dock system which would add 59 new slips to the marina. Ten of the existing 77 slips would be removed, for a total of 126 boat slips upon completion. (R. 4.) Port Harbor's application was later amended to be a partially after-the-fact application to include a request for approval of the 2018 addition to the dock system that had been completed without a permit.

DEP staff reviewed photographs and maps of the area, inspected and photographed the site, and utilized the Department's Visual Impact Assessment Matrix to evaluate the potential visual impact of the proposed project. (R. 13.) Interested parties expressed concerns at a meeting of the Planning Board of the Town of Raymond, and Department staff considered the concerns raised that were relevant to the DEP's licensing criteria during its review of the application. (R. 18.) Abutters raised concerns that the project would interfere with their views of the lake, devalue their property, impede their enjoyment of a privately owned beach, and negatively impact the environment. (R. 18.) The Department also received and reviewed written comments from 17 interested persons, including individuals who own property at the Indian Point subdivision and are members of the IPOA, in which similar concerns were expressed. (R. 55, 67, 64, 68, 70, 71, & 81.) The record also contains comments from the Department of Inland Fisheries and Wildlife stating that no mapped Essential Habitats, Significant Wildlife Habitats, or fisheries habitats would be directly affected by the project. (R. 15).

On March 31, 2020, the Department issued an order granting Port Harbor's partially after-the-fact NRPA permit. (R. 84.) MacKay timely appealed the decision to the Superior Court. Petitioner challenges the DEP's decision on several grounds and also asks the court to declare that Chapter 315 of the Department's rules are invalid.

2

## II.     Standard of Review

The court's review of an agency's decision is "deferential and limited." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128. When acting in an appellate capacity pursuant to Rule 80C of the Maine Rules of Civil Procedure, the court reviews the agency's decision for "an abuse of discretion, error of law, or findings not supported by the evidence." *Guar. Trust Life Co. v. Superintendent of Ins.*, 2013 ME 102, ¶ 16, 82 A.3d 121; 5 M.R.S. §§ 11001-11008. Pursuant to 5 M.R.S. § 11007, the court may reverse an agency decision upon a finding that the decision is "(1) In violation of constitutional or statutory provision; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by bias or error of law; (5) Unsupported by substantial evidence on the whole record; or (6) Arbitrary and capricious or characterized by abuse of discretion." 5 M.R.S. § 11007(4)(c)(1)-(6). The court is not permitted to substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3).

The party seeking to overturn the agency's decision bears the burden of persuasion. *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 15, 989 A.2d 1128. The court examines "the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did." *Int'l Paper Co. v. Bd. of Envtl. Prot.*, 1999 ME 135, ¶ 29, 737 A.2d 1047. The court "must affirm findings of fact if they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency." *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 13, 989 A.2d 1128.

An agency's interpretations of its own rules are given "considerable deference." *Friends of the Boundary Mts. v. Land Use Reg. Comm'n*, 2012 ME 53, ¶ 6, 40 A.3d 947. The court will not set aside an agency's interpretation of its own rules "unless

3

the rule plainly compels a contrary result, or the rule interpretation is contrary to the governing statute." *Id.* The court reviews an agency's interpretation of a statute by looking to the plain language of the statute. *Bankers Life & Cas. Co. v. Superintendent of Ins.*, 2013 ME 7, ¶ 15, 60 A.3d 1272. When the statute is ambiguous, the court will review "whether the agency's construction is reasonable." *FPL Energy Me. Hydro LLC v. Dep't of Envtl. Prot.*, 2007 ME 97, ¶ 11, 926 A.2d 1197 (quotations omitted).

## III. Discussion

Before it may issue a permit under the NRPA, the DEP must determine that the application meets the standards listed in 38 M.R.S. § 480-D. *See Uliano v. Bd. Of Envtl. Prot. (Uliano I)*, 2005 ME 88, ¶ 7, 876 A.2d 16 ("The nine standards that an applicant must meet to receive a permit for activities that are regulated by the NRPA relate to (1) existing uses; (2) soil erosion; (3) habitats and fisheries; (4) natural water flow; (5) water quality; (6) flooding; (7) sand supply; (8) natural and recreational features of river segments; and (9) dredging.")

Petitioner challenges DEP's factual findings and legal conclusions, as well as the validity of Chapter 315 of DEP's rules.

### a. The 2018 Dock Expansion

As an initial matter, Petitioner argues that Port Harbor's installation of four new permanent pilings and a dock without a permit in 2018, for which the applicant sought after-the-fact approval, did not receive adequate attention by the DEP and that it failed to apply the mandatory legal standards in granting a retroactive permit. (Pet'r's Br. 13.) Petitioner contends that the decision to retroactively grant a permit for the installation of the 2018 pilings must be vacated because the DEP decision does not discuss or make separate factual findings for these pilings. *Id.*

4

The court concludes that the DEP's decision to require an additional $334 as an after-the-fact filing fee and evaluate the 2018 pilings in conjunction with the overall expansion was within the Department's discretion and does not provide a basis for vacating its decision. (R. 8.)

### b. Existing Scenic and Aesthetic Uses

Petitioner argues that the DEP erred in concluding that the proposed activity would not unreasonably interfere with the existing scenic and aesthetic character of Sebago Lake, arguing that this was legal error and unsupported by substantial evidence. (Pet'r's Br. 15.)

Under 38 M.R.S. § 480-D(1), an applicant must demonstrate that the proposed activity "will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses." With respect to scenic and aesthetic characteristics, Chapter 315 of the DEP's rules provides the following guidance for making this determination:

> The potential impacts of a proposed activity will be determined by the Department considering the presence of scenic resources listed in Section 10, the significance of the scenic resource, the existing character of the surrounding area, the expectations of the typical viewer, the extent and intransience of the activity, the project purpose, and the context of the proposed activity . . .

06-096, C.M.R., Ch. 315, § 2.

Chapter 315 defines scenic resources as "[p]ublic natural resources or public lands visited by the general public, in part for the use, observation, enjoyment, and appreciation of natural or cultural visual qualities." Ch. 315, § 5(H). The Department noted interested persons' comments about the impacts to their views from private beaches, but concluded that "potential visual impacts from these beaches are not within the scope of the Department's review, as these are private beaches and do not qualify as scenic resources under Chapter 315." (R. 84.)

While Petitioner separately challenges Chapter 315 as inconsistent with the intent of the NRPA, he also contends that it was error for DEP to narrowly focus on the vantage point from private beaches to the exclusion of other vantage points and from out on Sebago lake itself. (Pet'r's Br. 16.) However, the record supports the conclusion that the Department appropriately analyzed the proposed project's impacts on existing scenic and aesthetic uses to users of the lake at large using the guidance set forth in Chapter 315.

While acknowledging that the proposed expansion would be visible from several vantage points on the water, the Department determined that the additional slips would not result in an unreasonable adverse visual impact. (R. 84.) DEP reached this conclusion based upon the Department's Visual Impact Assessment Matrix, a site visit, a review of comments by members of the public, and site descriptions, photographs, and plans submitted by the applicant (R. 13., 84.). DEP staff noted that the overall visual impact severity rating was "low" due to the fact that the project was located on a "commercially and residentially developed shoreline." (R. 13.) (Resp't's Br. 16.) Moreover, the Department found that the area surrounding the project site "contains residential structures, lawns, and docks that are visible from the resource." (R. 84.) It further noted the presence of other public boat launch facilities and Port Harbor's existing marina, as well as Panther Run, a commercial marina located nearby, concluding that "the location and scale of the proposed activity is compatible with the existing visual quality and landscape characteristics found within the viewshed of the scenic resource in the project area." (R. 84.)

DEP's conclusion that the visual and aesthetic character of the area would not be unreasonably impacted was supported by substantial evidence in the record.

*c. Recreational and Navigational Resources*

38 M.R.S. § 480-D(1) also requires a finding that the proposed use will not unreasonably interfere with existing recreational and navigational uses. Petitioner argues that DEP erred in concluding that there were no existing recreational or navigational uses of the resource that would be unreasonably impacted by the proposed project. (Pet'r's Br. 20.) He also contends that DEP failed to take into account the impacts the expansion would have on users of private land, since the public/private land distinction is irrelevant to the recreational and navigational uses analysis. (Pet'r's Br. 21.)

It is undisputed that Sebago Lake, including the area of Jordan Bay, is a popular boating destination. Petitioner himself acknowledges that Sebago Lake is "one of—if not the most—popular recreational boating lakes in the State of Maine . . . . " (Pet'r's Br. 33.) The Department took the existing level of recreational boating activity into account in reaching its decision, including the extensive system of boat slips located on IPOA property. (R. 22, 71, & 77.) Concerns about the safety of swimmers in the IPOA's swim area were also addressed. (R. 71.) DEP concluded that "based on the nature of the proposed project, its location and level of existing motorized boating in the area and on the lake, there are no existing recreational or navigational uses of the resource that would be unreasonably impacted." (R. 84.)

The court concludes that DEP's determination that the proposed activity would not unreasonably interfere with existing recreational and navigational uses was supported by competent evidence.

*d. Wildlife Habitat, Water Quality, and Environmental Impact*

7

38 M.R.S. § 480-D(3) requires a finding that the proposed activity will not unreasonably harm any significant wildlife habitat, freshwater wetland plant habitat, threatened or endangered plant habitat, aquatic or adjacent upland habitat, travel corridor, freshwater, estuarine or marine fisheries or other aquatic life. The Department utilized its GIS database to determine that there were no mapped essential or significant wildlife habitats in the area of the project site. (R. 84.) The record also includes a determination from the Maine Department of Inland Fisheries and Wildlife that there were neither any "Endangered, Threatened or Special concern species" nor any "Essential or Significant Wildlife Habitats" that would be impacted by the project. (R. 15.)

38 M.R.S. § 480-D(5) requires a finding that the proposed project will not violate any water quality law. Petitioner contends that the Department's analysis was inadequate because it only considered the impact on water quality of the new physical structure, and did not separately analyze the impact of the increased boat traffic that the expansion would entail. (Pet'r's Br. 24.) As Respondent points out, Petitioner does not make reference to any specific water quality law that would be violated by the expansion. Moreover, the proposed expansion is "merely the addition of slips, an extension of existing uses in the area, and does not represent a radical change in the character of recreational usage of Sebago Lake." (Resp't's Br. 26.)

DEP's determination that Port Harbor's application meets § 480-D's standards for impacts on habitats, fisheries, and water quality is legally correct and supported by the record evidence.

*e. The Alternatives Analysis*

Petitioner next argues that DEP erred in concluding that Port Harbor had avoided and minimized great ponds impacts in accordance with Chapter 310, the

8

Department's Wetlands and Waterbodies Protections Rules. (Pet'r's Br. 24.) Chapter 310 provides that an "activity will be considered to result in an unreasonable impact if the activity will cause a loss in wetland area, functions, or values, and there is a practicable alternative to the activity that would be less damaging to the environment." 06-096 C.M.R. 310 § 5(A).

In conducting its Chapter 310 analysis, the DEP made the following findings: the dock system had been designed with the minimum dimensions practicable; the new permanent pilings will impact just 38 square feet and there will be no adverse impact on wildlife habitat or fisheries as determined by the MDIFW; the applicant considered and ruled out multiple alternatives to the proposed project; and that the dock system will be removed seasonally, except for the 12 new permanent pilings. (R. 84.) These factors combined led the DEP to conclude that any impacts to Sebago Lake were minimized to the greatest extent practicable, and that the requirements of Chapter 310 were satisfied.

The Law Court has held that Chapter 310's "practicable alternatives" analysis is "a factor that should be balanced in [the Department's] section 480-D(1) analysis," and is not an independent criterion for the issuance of an NRPA permit. *Uliano v. Bd. of Envtl. Prot.*, 2009 ME 89, ¶ 40, 977 A.2d 400. In light of the DEP's overall assessment of the proposal's negligent environmental impacts, the court defers to the Department's conclusion that "the proposed project represents the least environmentally damaging alternative that meets the overall purpose of the project." (R. 84.) The Petitioner has not met his burden of establishing that the Department's decision was unreasonable.

*f. Archaeological Survey*

Petitioner challenges the Department's decision to grant the permit without an archeological survey, as initially recommended by the Maine Historic Preservation Commission. Neither the NRPA nor rules promulgated by the Department require the

9

Department to consider impacts to archeological resources to issue an NRPA permit. *See* 38 M.R.S. § 480-D (1)-(11). Whether or not an archaeological survey was conducted is therefore not relevant to the NRPA permit that is the subject of this appeal.

g. *Validity of DEP Rule at Chapter 315, Assessing and Mitigating Impacts to Scenic and Aesthetic Uses (06-096 C.M.R. ch. 315)*

Petitioner next brings a substantive challenge to Chapter 315 of the Department's rules, entitled "Assessing and Mitigating Impacts to Scenic and Aesthetic Uses." 06-096 C.M.R. ch. 315.

5 M.R.S. § 8058 establishes the standard for judicial review of an agency rule. If the rule is "within the agency's rule-making authority, it is reviewed substantively to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Conservation Law Found. v. Dep't of Envtl. Prot.*, 2003 ME 62, ¶ 21, 823 A.2d 551, 559 (quotations omitted).

Chapter 315 was promulgated to interpret and provide guidance for the Department in evaluating the NRPA's scenic and aesthetic use criterion. (Resp't's Br. 10.) It specifies the viewpoints to be taken into account when evaluating whether a proposed development will interfere with existing scenic and aesthetic uses of the resource, and excludes the consideration of views from private property. The Department applied Chapter 315 in determining that it could not consider the impact that the project may have on scenic views from private beaches, including those of the IPOA, because private property does not qualify as a "scenic resource" under the rule. The definition of "scenic resources" is limited to "[p]ublic natural resources or public lands visited by the general public, in part for the use, observation, enjoyment, and appreciation of natural or cultural visual qualities." 06-096 C.M.R. ch. 315, § 5(H).

Petitioner contends that Chapter 315's definition of "scenic resources" is contrary to the intent and plain language of the statute and is invalid as beyond DEP's delegated authority to enact rules. (Pet'r's Br. 44.) He argues that the narrow definition "has no support whatsoever in the [NRPA]" and that it "discriminates against private landowners without support in the statute, in a manner that will imperil not protect natural resources, contrary to the plain language and intent of the statute." *Id.*

Although the NRPA does not specify the vantage points from which scenic impacts should be considered, "it is the resources themselves, and the uses of those resources, which are the focus of the law." (Resp't's Br. 12.) During the 2003 rulemaking process when Chapter 315 was adopted, the Department specifically rejected the suggestion of a public comment that the definition of "scenic resources" was too narrow and that private lands should be included, responding that this change "would result in a substantial increase in the Department's oversight of private lands and the applicant's burden." (R. 85.) As Respondent points out, "the interpretation urged by MacKay would have the Department consider whether a proposed development would affect scenic enjoyment . . . from private residences, an approach that would result in the Department's permit review process becoming inextricably entangled in aesthetic disputes among private landowners." *Id.*

The Department's interpretation of the NRPA in drafting Chapter 315 was reasonable, and a contrary result is not compelled by the statutory language.

## IV. Conclusion

For the foregoing reasons, the court affirms the Maine Department of Environmental Protection's decision dated March 31, 2020, and Petitioner MacKay's appeal is denied.

11

The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: _July 19, 2021_                    _____
                                          MaryGay Kennedy, Justice
                                          Maine Superior Court