MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2022 ME 19
Docket:        Cum-21-113
Argued:        November 3, 2021
Decided:       March 31, 2022

Panel:         STANFILL, C.J., and MEAD, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

MAQUOIT BAY, LLC, et al.

v.

DEPARTMENT OF MARINE RESOURCES et al.

STANFILL, C.J.

[¶1]  Maquoit Bay, LLC, and its sole members, Paul and Kathleen Dioli, (collectively, the Diolis) appeal from a judgment of the Superior Court (Cumberland County, *McKeon, J.*) affirming the Department of Marine Resources' (DMR) decision to grant an aquaculture lease to Mere Point Oyster Company, LLC (MPOC) in Maquoit Bay.  We affirm.

## I.  BACKGROUND

[¶2]   In February 2018, MPOC applied for a ten-year standard aquaculture lease for a site in Maquoit Bay located approximately 1,250 feet from the Diolis' shorefront property on Mere Point in Brunswick.  The Diolis participated as limited intervenors in DMR's review of MPOC's application.

*See* 13-188 C.M.R. ch. 2, § 2.20(3)(B) (effective Oct. 17, 2013).[1] The Diolis argued to DMR that the proposed lease would unreasonably interfere with the ingress to and egress from their property as well as their navigation routes in the bay. After a public hearing, DMR approved MPOC's application in December 2019 over the objections of the Diolis and other community members, finding that the lease would not unreasonably interfere with the ingress and egress of riparian owners or with navigation, fishing, and other existing uses in and around the lease site. *See* 12 M.R.S. § 6072 (7-A) (2021); 13-188 C.M.R. ch. 2, § 2.37(1)(A).

[¶3] The Diolis filed a Rule 80C petition requesting review of DMR's decision and joining independent claims that challenged various aspects of MPOC's application and the regulations that DMR followed in reviewing and approving it. *See* M.R. Civ. P. 80C(a), (i). They also joined a claim against MPOC owner and Brunswick Harbormaster Dan Devereaux individually. DMR moved to dismiss the Diolis' independent claims and to sever the claim against Devereaux. On April 17, 2020, the court ordered that the case would proceed

---

[1] DMR regulations governing aquaculture leases, currently codified at 13-188 C.M.R. ch. 2 (2022), have been amended in various ways since 2018. In this opinion, we interpret the aquaculture lease regulations as they existed when MPOC submitted the contested lease application to DMR in February 2018 and generally do not discuss the regulations as they are now codified.

as an administrative appeal and deferred judgment on DMR's motion to dismiss until after oral arguments.

[¶4]  The court affirmed DMR's approval of MPOC's lease application on January 14, 2021.  The court also dismissed all independent claims joined with the Rule 80C petition except for the claim against Devereaux. M.R. Civ. P. 80C(i). The Diolis filed consented-to motions for final partial judgment, M.R. Civ. P. 54(b)(1), and to stay further proceedings on the claim against Devereaux during the pendency of their anticipated appeal to us.  M.R. Civ. P. 62(e).  The court granted those motions on March 22, 2021, certifying the partial judgment as a final judgment,[2] directing entry of judgment against the Diolis on their Rule 80C petition and the six independent counts that had been dismissed, and staying the claim against Devereaux.  The Diolis timely appealed.  *See* M.R. App. P. 2B(c)(1); 5 M.R.S. § 11008(1) (2021).

## II.  DISCUSSION

[¶5]  In an appeal from a Superior Court judgment on a Rule 80C petition, we review the underlying administrative agency decision directly for abuse of discretion, errors of law, or findings unsupported by substantial evidence in the

---

[2]  The court properly certified the partial final judgment because it made specific findings and provided a reasoned statement explaining its decision.  *See Guidi v. Town of Turner,* 2004 ME 42, ¶¶ 8-10, 845 A.2d 1189; M.R. Civ. P. 54(b)(1).

4

record. *Somerset Cnty. v. Dep't of Corr.*, 2016 ME 33, ¶ 14, 133 A.3d 1006. The party challenging the agency decision bears the burden of persuasion on appeal. *Id.*

## A. "Riparian Owner"

[¶6] The Diolis contend that DMR exceeded its authority by adopting a definition for "riparian owner" that conflicts with the plain language of 12 M.R.S. § 6072(7-A)(A) and is illogical in the context of the broader statutory scheme. That definition, the Diolis argue, led DMR to improperly disregard their concerns when considering whether MPOC's proposed lease would unreasonably interfere with the ingress and egress of riparian owners. Though DMR's regulatory definition is inconsistent with 12 M.R.S. § 6072(7-A)(A), we affirm because the agency's decision ultimately complied with the statute.

[¶7] We begin our review of an administrative agency's interpretation of a statute by determining de novo whether the plain meaning of the underlying statute is ambiguous. *NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n*, 2020 ME 34, ¶ 22, 227 A.3d 1117. Section 6072(7-A) establishes conditions that a proposed lease must meet before DMR may grant an aquaculture lease application, including the following:

**A.** The lease will not unreasonably interfere with the ingress and egress of riparian owners.

**B.** The lease will not unreasonably interfere with navigation.

**C.** The lease will not unreasonably interfere with fishing or other uses of the area. . . .

**D.** The lease will not unreasonably interfere with significant wildlife habitat and marine habitat or with the ability of the lease site and surrounding marine and upland areas to support existing ecologically significant flora and fauna.

**E.** The applicant has demonstrated that there is an available source of organisms to be cultured for the lease site.

**F.** The lease does not unreasonably interfere with public use or enjoyment within 1,000 feet of a beach, park or docking facility owned by the Federal Government, the State Government or a municipal governmental agency or certain conserved lands. . . .

**G.** The lease will not result in unreasonable impact from noise or light at the boundaries of the lease site.

12 M.R.S. § 6072(7-A). The statute does not define the scope of "riparian owner," but the meaning of section 6072(7-A)(A) is clear: DMR cannot approve a lease that will unreasonably interfere with the ingress and egress of *any* riparian owner.

[¶8] Although our review of agency action generally ends by applying an unambiguous statute's plain meaning, *NextEra Energy Res., LLC*, 2020 ME 34, ¶ 22, 227 A.3d 1117, our inquiry in this case continues because section

6

6072(7-A) also authorizes DMR to make rules further defining the conditions a proposed lease must meet, including what constitutes unreasonable interference with the ingress and egress of riparian owners. 12 M.R.S. § 6072(7-A); *see also id.* § 6072(13)(F) (authorizing DMR to make rules for "defining [lease] application requirements, an application review process and decision criteria"). But DMR's rulemaking authority is not limitless; the agency cannot adopt a rule that "is not in accord with the underlying statute." *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 458 A.2d 739, 741 (Me. 1983). Pursuant to its statutory authority, DMR defines "riparian owner" for all purposes under section 6072 as a "shorefront property owner whose property boundaries are within 1000 feet of the proposed lease boundaries." 13-188 C.M.R. ch. 2, § 2.05(1)(C).

[¶9] The Legislature used the term "riparian owner" (and, alternatively, "owners of riparian land") throughout section 6072,[3] often with explanatory or limiting language. Indeed, there are several instances in which the statute expressly limits the class of riparian owners to those within 1,000 feet of a lease

---

[3] The Legislature amended this statute after MPOC submitted its application, but we apply the version in effect at the time of the application and decision. *See* P.L. 2021, ch. 52, §§ 1-9 (effective Oct. 18, 2021) (to be codified at 12 M.R.S. § 6072(6)(A)-(C), (11), (12), (12-A), (12-A)(C), (12-C), (13), (15)).

site. *See, e.g.*, 12 M.R.S. § 6072(5) (notice to riparian owners when an application is complete and a hearing is scheduled); *id.* § 6072(11-A)(D) (notice to riparian owners before DMR assigns a lease); *id.* § 6072(12-A) (notice to riparian owners when an application for a lease transfer is complete). Applying DMR's "riparian owner" definition to these provisions is redundant.[4]

[¶10]  In other parts of section 6072, DMR's "riparian owner" definition is superfluous because the statutory language itself limits the class of riparian owners to which it applies. *See* 12 M.R.S. § 6072(4)(F) (requiring lease applications to include written permission from every riparian owner whose land to the low-water mark will be used); *id.* § 6072(12-C)(A)(3) (same with respect to applications for lease expansion); *id.* § 6072(8)(C), (E) (establishing an order of preference when multiple applicants seek to lease the same area, including "[f]ourth, to the riparian owner of the intertidal zone in which the leased area is located" and "[s]ixth, to the riparian owner within 100 feet of leased coastal waters").

---

[4] Other provisions in section 6072 refer to "known riparian owners." *See* 12 M.R.S. § 6072(4)(G) (requiring lease applications to identify "known riparian owners as listed in the municipal tax records"); *id.* § 6072(6)(A) (requiring DMR to personally notify "known riparian owners" of hearings on lease applications); *id.* § 6072(12-C)(A)(4) (requiring that applications to expand a lease identify "known riparian owners as listed in the municipal tax records"). We do not decide whether DMR's "riparian owner" definition conflicts with those statutory provisions; it is possible that some limitation or definition may be appropriate in parts of the statute other than section 6072(7-A)(A).

[¶11]  In contrast, DMR's rule limiting the class of riparian owners to those within 1,000 feet of the proposed lease site is inconsistent with the plain language of the statutory provision central to the Diolis' appeal: 12 M.R.S. § 6072(7-A)(A).  A property's distance from a proposed lease site has little bearing on the question of whether a lease will unreasonably interfere with the ingress and egress of riparian owners.  The class of riparian owners to whom the statute could apply is finite but could easily include owners whose shorefront property is more than 1,000 feet from the lease site.  For example, if a proposed lease were located near the entrance to a long but narrow inlet, the lease, if granted, could effectively block ingress and egress for any riparian owner in the inlet regardless of the distance between the lease site and the shorefront properties.  The Legislature did not say that DMR must consider whether the lease will unreasonably interfere with the ingress and egress of only *some* riparian owners, and DMR cannot do so by rule.  *See Cent. Me. Power Co.*, 458 A.2d at 741 ("[R]ules promulgated by subordinate authority [that] tend to contravene the provisions of controlling law . . . are of no effect and will be promptly declared invalid." (quotation marks omitted)).

[¶12]  Relying on its definition of "riparian owner," DMR found that MPOC's proposed lease would not unreasonably interfere with the ingress and

egress of any riparian owners solely because no one, including the Diolis, owned property within 1,000 feet of MPOC's proposed lease boundaries. Nonetheless, DMR's ultimate decision complied with section 6072(7-A) even if its "riparian owner definition" was inconsistent with the statute. *See Kurzon v. U.S. Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976) ("While agency decisions must be sustained, if at all, on their own reasoning, this principle does not mechanically compel reversal when a mistake of the administrative body is one that clearly had no bearing on . . . the substance of the decision reached." (quotation marks and citation omitted)); *cf. Me. Motor Rate Bureau*, 357 A.2d 518, 527 (Me. 1976) (limiting judicial review of administrative action solely to whether the agency's grounds for decision were proper).

[¶13]  Specifically, despite finding that no individuals fit its "riparian owner" definition, DMR addressed the concerns that the Diolis and other shorefront property owners on Mere Point raised "about their ability to navigate to their docks and moorings" when the agency analyzed whether the lease would unreasonably interfere with navigation. *See* 12 M.R.S. § 6072(7-A)(B); 13-188 C.M.R. ch. 2, § 2.37(1)(A)(2).  Those concerns prompted DMR to move the proposed lease site one hundred feet westward to "provide[] additional navigable area between the proposed site and Merepoint

Neck."[5] DMR concluded that the adjusted lease site would not unreasonably interfere with navigation even though "the proposed site may prompt some vessels to alter their traditional course."

[¶14]    Because the lease decision reflects that DMR specifically considered how the proposed lease would affect the Diolis' ingress to and egress from their property, albeit in the context of analyzing the lease's effects on navigation, DMR complied with section 6072(7-A)(A)'s substantive requirements.    *See* 13-188 C.M.R. ch. 2, § 2.37(1)(A)(1) (directing DMR to "examine whether the riparian owners can safely *navigate* to their shore" when determining whether a proposed lease would unreasonably interfere with the ingress and egress of riparian owners (emphasis added)).    In other words, DMR's reliance on its "riparian owner" definition did not ultimately affect its analysis.

## B.    Practicable Alternatives

[¶15]  The Diolis next contend that DMR erred as matter of law by not requiring MPOC to assess whether there were practicable alternatives to the proposed lease site that would have a lesser impact on existing uses.

---

[5]  The lease site is also bisected by a four-hundred-foot, gear-free navigational corridor that gives Mere Point residents an option to access Maquoit Bay by navigating through the lease site in addition to navigating around it.

Specifically, the Diolis argue that the existence of practicable alternative locations must be considered to meet section 6072's "no unreasonable interference" standard. They also argue that DMR's refusal to require a practicable-alternatives analysis violates the public trust doctrine. Finding neither argument persuasive, we affirm this aspect of the judgment.

### 1. Statutory Requirements

[¶16] The Diolis rely on *Uliano v. Bd. of Env't Prot.* (*Uliano I*), 2005 ME 88, 876 A.2d 16, to support their argument that lease applicants must analyze practicable alternatives. In *Uliano I*, we vacated a Board of Environmental Protection decision after holding that the Board misapplied the Department of Environmental Protection's (DEP) rule that "'no activity shall be permitted if there is a practicable alternative to the project that would be less damaging to the environment.'" 2005 ME 88, ¶¶ 9, 16-17, 876 A.2d 16 (quoting 06-096 C.M.R. ch. 310, § 5(A) (2002).[6] Here, by contrast, section 6072 neither expressly nor impliedly requires DMR to consider practicable alternatives when making a lease decision, and DMR has no separate rule of its own analogous to any

---

[6] At the time of the *Uliano I* decision, section 5(A) required DEP to deny applications for projects in wetland areas whenever a practicable alternative existed that would be less damaging to the environment. DEP has since amended section 5(A) such that the agency can now deny applications only when a practicable alternative with lesser environmental impacts exists *and* "the activity will cause a loss in wetland area, functions, or values." 06-096 C.M.R. ch. 310, § 5(A) (effective Nov. 11, 2018).

version of DEP's practicable-alternatives standard. Moreover, the particular procedure that the Diolis say is necessary—"an alternatives analysis demonstrating that *no other lease area exists* with a lesser impact on existing and surrounding uses"—would be impracticable for applicants to follow and for DMR to administer. (Emphasis added.) Neither *Uliano I* nor the statues and regulations governing aquaculture leases compel such an analysis. *See Uliano I*, 2005 ME 88, ¶¶ 10-11, 876 A.2d 16 (assessing practicable alternatives to a proposed pier—not alternative locations for the pier—for accessing a boat at all tides). Therefore, DMR did not err by approving the lease application without requiring MPOC to consider practicable alternatives.

### 2. Public Trust Doctrine

[¶17] With regard to the public trust doctrine, the Diolis assume, incorrectly, that DMR lease decisions are quasi-legislative acts that demand a balancing of public and private interests beyond what section 6072 requires. Unlike quasi-legislative acts such as rulemaking, DMR lease decisions are not "focused on policy matters of general applicability." *Forest Ecology Network v. Land Use Reg. Comm'n*, 2012 ME 36, ¶ 46, 39 A.3d 74. Rather, when approving or denying an aquaculture lease application, DMR adjudicates individual rights based on the statutory framework and evaluation criteria that the Legislature

devised. *See* 12 M.R.S. § 6072(6) (characterizing as an "adjudicatory proceeding" the public hearing that DMR must hold prior to granting a lease); 5 M.R.S. § 8002(1) (2021) (defining "adjudicatory proceeding" as "any proceeding before an agency in which the legal rights, duties or privileges of specific persons are required by . . . statute to be determined after an opportunity for hearing").

[¶18]    When, as here, DMR approves an application, the leased submerged lands remain "subject to the public trust" because the public retains certain rights such as fishing and navigation. *Norton v. Town of Long Island*, 2005 ME 109, ¶ 32, 883 A.2d 889.  DMR considered those rights by evaluating whether MPOC's prospective lease would unreasonably interfere with existing uses, including public uses, as it was required to do.  *See* 12 M.R.S. §§ 6072(7-A)(B), (C), (F).  The public trust doctrine does not impose any additional burden on DMR to protect the public's interest in submerged lands, and DMR did not err by balancing the interests of MPOC and the public pursuant to section 6072's express requirements.

14

## C.  Burden Shifting

[¶19]  The Diolis argue that DMR improperly shifted the burden from MPOC to a group of limited intervenors to prove that MPOC's proposed lease would not unreasonably interfere with commercial fishing.  *See* 12 M.R.S. § 6072(7-A)(C).  We disagree.  DMR's lease decision reflects that the agency relied on information from multiple sources—DMR staff, three harbormaster questionnaires, and several commercial fishermen, including members of a limited intervenor group—in finding no unreasonable interference with commercial fishing.  That reliance is consistent with DMR's standard practice for developing the record that it uses to evaluate lease applications. *See* 13-188 C.M.R. ch. 2, § 2.37(1); *see e.g.* 12 M.R.S. § 6072(5-A) (requiring DMR to assess the proposed site and surrounding areas before a public hearing on a lease application to determine the possible effects of the lease on commercially significant fauna and traditional fisheries); 13-188 C.M.R. ch. 2, § 2.31(4)-(7) (permitting a broad range of people to testify at public hearings on lease applications); *id.* § 2.27(2) (requiring DMR to request information from the municipal harbormaster about a proposed lease's impact on existing uses, including fishing).  The Diolis have not met their burden of showing that DMR's finding that the lease would not unreasonably interfere with commercial

fishing was made upon unlawful procedure. *See* 5 M.R.S. § 11007(4)(C)(3) (2021); *Cent. Me. Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 19, 90 A.3d 451.

## D. "Non-discharge" Designation

[¶20] We also disagree with the Diolis' contention that DMR erred by designating MPOC's lease proposal as a "non-discharge" application. *See* 13-188 C.M.R. ch. 2, § 2.10(3)(C) (classifying applications for standard aquaculture leases as either "discharge" or "non-discharge"). DMR defines "discharge" for the purpose of its aquaculture lease regulations as "any spilling, leaking, pumping, pouring, emptying, dumping, disposing or addition of any pollutant including, but not limited to, the addition of feed, therapeutants or pesticides to the waters of the State." 13-188 C.M.R. ch. 2, § 2.05(1)(G). Because DMR's discharge designation raises a mixed question of fact and law and the designation was reasonable, we defer to DMR's determination and affirm. *Cf. LaMarre v. Town of China*, 2021 ME 45, ¶ 16, n.6, 259 A.3d 764. The Diolis' argument that the generators, power washers, and seafood-processing equipment that MPOC plans to use at the lease site will "inevitably" result in discharges is speculative and does not persuade us to disturb DMR's conclusion. *See id.*

16

## E.   Notice to DEP

[¶21]  We also reject the Diolis' argument that DMR failed to properly give notice to DEP about MPOC's completed lease application.  *See* 12 M.R.S. § 6072(6)(C) (2018)[7].  The record reflects that DMR notified DEP about MPOC's completed application on February 15, 2018, which defeats both the Diolis' notice argument and their related contention that the allegedly improper notice undermined DEP's ability to consider the application of the Natural Resources Protection Act.[8]

## F.   Conflict of Interest

[¶22]   Finally, contrary to the Diolis' contention that Devereaux's involvement compromised the fairness of the proceedings, we see no conflict of interest arising from Devereaux's dual roles as an MPOC owner and as Brunswick Harbormaster.  Though Devereaux acted in both capacities when MPOC initially approached DMR about securing an aquaculture lease, he recused himself as harbormaster—at DMR's insistence—sixteen days after the pre-application meeting, the first step in what amounted to a two-and-a-half-

---

[7]  Since the submission of MPOC's application, this section of the statute has been amended to require notice to the DEP only of "applications that involve activities that have a discharge into the waters of the State."  P.L. 2021, ch. 52, § 3 (effective Oct. 18, 2021).

[8]  We also note that the Diolis' argument about the applicability of the Natural Resources Protection Act fails because they raise it for the first time on appeal.  *See Cyr v. Cyr*, 432 A.2d 793, 797 (Me. 1981).

year process. *See* 13-188 C.M.R. ch. 2, § 2.07(1). Competent evidence supports the conclusion that Deveraux's prompt recusal removed him from a position of influence over the lease decision-making process and effectively eliminated the opportunity for him to taint the proceedings by placing his personal pecuniary interests over his duties as a public servant. *See Tuscan v. Smith*, 130 Me. 36, 46, 153 A. 289 (1931).

The entry is:

Judgment affirmed.

---

David M. Kallin, Esq. (orally), and Amy K. Olfene, Esq., Drummond Woodsum, Portland, for appellants Maquoit Bay, LLC, Paul C. Dioli, and Kathleen M. Dioli

Aaron M. Frey, Attorney General, and Mark Randlett, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Marine Resources

Patrick W. Lyons, Esq, and P. Andrew Hamilton, Esq., Easton Peabody, Bangor, for appellee Mere Point Oyster Company, LLC

Jonathan W. Brogan, Esq., and Trevor D. Savage, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellee Daniel R. Devereaux