MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2023 ME 25
Docket:        Cum-23-83
Argued:        March 30, 2023
Decided:       April 10, 2023

Panel:         STANFILL, C.J., and MEAD, HORTON, LAWRENCE, and DOUGLAS, JJ.
Majority:      MEAD, HORTON, LAWRENCE, and DOUGLAS, JJ.
Dissent:       STANFILL, C.J.


WAYNE R. JORTNER et al.

v.

SECRETARY OF STATE


HORTON, J.

[¶1]  The Secretary of State appeals from a judgment entered by the Superior Court (Cumberland County, *MG Kennedy, J.*) in favor of Wayne R. Jortner, Richard Bennett, John Clark, and Nicole Grohoski (collectively, Jortner) on Jortner's petition to the Superior Court for review of the Secretary of State's decision determining the wording of a ballot question for citizen-initiated legislation.  Contending that the Superior Court erred in vacating her decision, the Secretary of State maintains that her wording of the question meets the statutory requirements that it be "understandable to a reasonable voter reading the question for the first time" and that it "will not mislead a reasonable voter who understands the proposed legislation into

voting contrary to that voter's wishes." 21-A M.R.S. § 905(2) (2023). Reviewing the Secretary of State's decision independently, we reach the same conclusion as the Superior Court: the decision must be vacated and the matter remanded to the Secretary of State for reformulation of the question.

## I. BACKGROUND

[¶2] Jortner and others applied to the Secretary of State for authorization to circulate a petition for a citizens' initiative proposing legislation entitled "An Act To Create the Pine Tree Power Company, a Nonprofit, Customer-owned Utility." *See* 21-A M.R.S. § 901 (2023). The petition, including its proposed legislation, was approved for circulation, and in November 2022, the Secretary of State certified that the initiators of the legislation had obtained sufficient valid signatures. *See* Pine Tree Power Petition, available at https://perma.cc/864H-CFHB; 21-A M.R.S. §§ 901, 902, 903-A, 905(1) (2023); Me. Const. art. IV, pt. 3, § 18, cls. 1, 2.

[¶3] On December 21, 2022, the Secretary of State released a proposed ballot question for public comment. *See* 21-A M.R.S. §§ 901(4), 905-A, 906 (2023). On January 30, 2023, after the public comment period had closed, the Secretary of State decided on the final wording for the ballot question:

**Do you want to create a new quasi-governmental power company governed by an elected board to acquire and operate existing for-profit electricity transmission and distribution facilities in Maine?**

Although some commenters had urged that the proposed Pine Tree Power Company (the Company) should be described as "consumer-owned" rather than "quasi-governmental," the Secretary of State decided to use the term "quasi-governmental" for the following reasons:

- The Act would create the Company as a "body corporate and politic," a term used in the Maine Revised Statutes to describe other quasi-governmental entities.

- The Company would be classified as a "general government" entity for purposes of board member compensation under 5 M.R.S. § 12004-G (2023).

- The Company would be permitted to borrow under statutes applicable to quasi-municipal entities.

- A majority of the board of directors would be elected in elections governed by Title 21-A of the Maine Revised Statutes.

- Candidates for election to the board would be eligible to seek Maine Clean Election Act funds.

- The Company would be subject to the Maine Freedom of Access Act.

- The Company would be authorized under the Maine Administrative Procedure Act to adopt regulations having legal force.

- Although the Act would classify the Company as "consumer-owned," the term is misleading because it could, in the Secretary of State's words, inaccurately "suggest to voters that that consumers would be acquiring shares or some other formal ownership stake in the new entity."

4

[¶4]  On February 9, 2023, Jortner filed in the Superior Court a timely petition for judicial review of the Secretary of State's decision.  *See* 21-A M.R.S. §§ 901(7), 905(2); M.R. Civ. P. 80C.  Jortner argued that the term "quasi-governmental power company" is incomprehensible and misleading because there is no statutory definition of the term, and that the term would confuse and mislead reasonable voters, whereas voters would understand the term "consumer-owned transmission and distribution utility."  He argued that voters might improperly believe that the Company would be privately managed, that it would be a taxpayer-funded organ of government, or that it would be run by the government.  In contrast, he argued, the term "consumer-owned" appears in other statutes, was used in the petitions themselves and in other related documents, and is the most accurate descriptor of the Company.  The relief sought in his petition included a request that the court "[m]odify the [Secretary of State's] Decision by substituting the term 'consumer-owned transmission and distribution utility' for 'quasi-governmental power company' in the Ballot Question."

[¶5]  The court considered these arguments and those of the Secretary of State and issued a decision on March 9, 2023, vacating the Secretary of State's decision.  The court reasoned that the term "quasi-governmental" is not

understandable to a reasonable voter, especially because it is not a term defined in Maine's statutes, and that the term is misleading because it suggests that the Company would be funded by taxpayers rather than consumers, whereas the core feature of the proposed legislation is consumer funding and ownership. The court declined Jortner's request that it modify the question to use the term "consumer-owned" and instead remanded the matter to the Secretary of State to revise the wording of the question. *See* Me. Const. art. IV, pt. 3, § 20 (allocating the task of drafting the ballot question to the Secretary of State).

[¶6] The Secretary of State timely appealed. *See* 21-A M.R.S. § 905(3); M.R. App. P. 1A. We issued an expedited briefing schedule, established the order of proceedings for oral argument, and accepted briefs from the parties and amici curiae Maine Affordable Energy Ballot Question Committee, Maine Energy Progress Political Action Committee, and The Sierra Club. In their briefs, both the Secretary of State and Jortner focus on the term "quasi-governmental." Jortner does not maintain on appeal his argument that the ballot question should incorporate the term "consumer-owned" instead of the term "quasi-governmental," and we deem that argument withdrawn.

## II. DISCUSSION

[¶7] Our discussion will begin with a summary of our standard of review and existing statutory language and interpretations, and will then proceed to an analysis of the issue presented here.

## A. Standard of Review and Pertinent Law

[¶8] Because, by statute, our "standard of review must be the same as for the Superior Court," 21-A M.R.S. § 905(3), we engage in a direct review of the ballot question as drafted by the Secretary of State, without reference to the Superior Court's judgment, to "determine whether the description of the subject matter is understandable to a reasonable voter reading the question for the first time and will not mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes," *id.* § 905(2); *see Olson v. Sec'y of State*, 1997 ME 30, ¶ 4, 689 A.2d 605. This standard of review subsumes our review of whether the Secretary of State met her constitutional obligation to "prepare the ballots in such form as to present the question or questions concisely and intelligibly," Me. Const. art. IV, pt. 3, § 20, and her statutory obligation to "write the question in a clear, concise and direct manner that describes the subject matter of the . . . direct initiative as simply as

is possible," 21-A M.R.S. § 906(6)(B).[1] *See Olson*, 1997 ME 30, ¶ 6, 689 A.2d 605; *cf. Allen v. Quinn*, 459 A.2d 1098, 1100 (Me. 1983) (indicating that when interpreting the citizen-initiative provisions of the Maine Constitution, "we seek the meaning which the words would convey to an intelligent, careful voter" (quotation marks omitted)); *Payne v. Sec'y of State*, 2020 ME 110, ¶ 18, 237 A.3d 870 (same). The burden of persuasion is on the party challenging the Secretary of State's action. *See Olson*, 1997 ME 30, ¶ 7, 689 A.2d 605; *see also* 21-A M.R.S. § 905(2) (providing for an appeal to be brought in accordance with M.R. Civ. P. 80C); *Maquoit Bay, LLC v. Dep't of Marine Res.*, 2022 ME 19, ¶ 5, 271 A.3d 1183 ("The party challenging the agency decision bears the burden of persuasion on appeal.").

[¶9] We have considered on two occasions whether ballot questions met the standard set forth in section 905(2). *See Olson*, 1997 ME 30, ¶¶ 7-11, 689 A.2d 605; *Wagner v. Sec'y of State*, 663 A.2d 564, 568 (Me. 1995). In *Wagner*, the drafted question was as follows:

> Do you favor the changes in Maine law limiting protected classifications, in future state and local laws to race, color, sex, physical or mental disability, religion, age, ancestry, national origin,

---

[1] Title 21-A M.R.S. § 906(6)(B) was amended after we decided *Olson v. Secretary of State*, 1997 ME 30, 689 A.2d 605. *See* P.L. 2019, ch. 414, § 1 (effective June 20, 2019) (codified at 21-A M.R.S. § 906(6)(B) (2023)). We consider the standard of review laid out for us in 21-A M.R.S. § 905(2) (2023) to continue to subsume our review of the Secretary of State's statutory obligations described in section 906(6)(B) as that statute has been amended. *See Olson*, 1997 ME 30, ¶ 6, 689 A.2d 605.

familial status, and marital status, and repealing existing laws which expand these classifications as proposed by citizen petition?

*Wagner*, 663 A.2d at 566 n.3 (quotation marks omitted). We concluded that even if the question incorrectly implied that the proposed legislation would bind future lawmakers, the question would not mislead voters into voting contrary to their intent. *Id.* at 568.

[¶10] More recently, we considered a ballot question that the Secretary of State drafted to read as follows:

Should spraying pesticides from the air or putting pesticides in Maine's waters be a Class A crime?

*Olson*, 1997 ME 30, ¶ 3, 689 A.2d 605 (quotation marks omitted). We concluded that the use of the term "putting" was not misleading to a voter who understood the proposed legislation because, although the parties challenging the question suggested that the term carried an element of intent, the term's meaning was close to that conveyed in the proposed act, which criminalized "caus[ing], by any means, the introduction of" pesticides in Maine waters. *Id.* ¶¶ 7-9. We noted in support of our conclusion that the drafted question contained no express statement about an intent requirement and that a reasonable voter who understood the initiative would not be misled. *Id.* ¶ 9.

[¶11]  We further concluded that the use of the term "Class A crime" was understandable to a reasonable voter because, viewed with existing statutes, it adequately informed the voter of the choice presented.  *Id.* ¶¶ 10-11.  We assumed that "voters [would have] discharged their civic duty to educate themselves about the initiative," including about the statutory definition of a Class A crime.  *Id.* ¶ 11.

[¶12]  The ballot question drafting process, as we stated, "is designed to ensure that voters, who may be reading the *question* for the first time in the voting booth, will understand the subject matter and the choice presented."  *Id.* (emphasis added).  Nonetheless, "[v]oters are not to rely on the ballot question alone in order to understand the proposal."  *Id.*  In essence, the ballot question must ask a clear question about whether the voter wishes to approve proposed legislation of which the voter is presumed to be already aware.  *See id.*  We explicitly rejected "the notion that section 905 requires that the description be understandable to a voter who is reading both the question *and the legislation* for the first time."  *Id.* (emphasis added).

[¶13]  These opinions inform us that the question need not provide complete, comprehensive information about the legislation or its effect.  *See id.* ¶ 7 ("Merely demonstrating that the question creates a misleading impression

about the legislation is not enough."); *Wagner*, 663 A.2d at 568 ("Although the question may inaccurately suggest the legislation will limit the actions of future state legislatures, it is not misleading within the meaning of section 905(2)." (footnote omitted)). The statute is concerned with whether "a reasonable voter *who understands the proposed legislation*" but is reading the question for the first time would not be able to understand the question or would be misled "into voting contrary to that voter's wishes," 21-A M.R.S. § 905(2) (emphasis added)—not whether a voter who does not understand the proposed legislation would be able to fully understand it based on the question alone.

[¶14] The question must also represent the proposed legislation "concisely and intelligibly," Me. Const. art. IV, pt. 3, § 20, "in a clear, concise and direct manner that describes the subject matter of the . . . direct initiative as simply as is possible," 21-A M.R.S. § 906(6)(B). Thus, we consider whether the ballot question is clear and understandable and whether the ballot question will mislead a reasonable, informed voter into voting contrary to the voter's intent. *Id.* § 905(2); *Olson*, 1997 ME 30, ¶¶ 4-11, 689 A.2d 605; *Wagner*, 663 A.2d at 568.

**B.    Review of the Drafted Ballot Question**

[¶15] The Secretary of State's ballot question used the term at issue in

this appeal—"quasi-governmental"—to describe the Company. Jortner contends that the term "quasi-governmental" is both "incomprehensible" and "misleading" and therefore fails both the "understandable" and the "not mislead[ing]" requirements of section 905(2). The Secretary of State asserts that the term "quasi-governmental" meets both requirements and suggests that Jortner's preferred term, "consumer-owned," might "misguide" voters into believing that the Company would give consumers "some sort of formal ownership stake" in the Company.

[¶16] Because responsibility for formulating the question rests with the Secretary of State, our review focuses on whether the Secretary of State's term "quasi-governmental power company" (1) is "understandable to a reasonable voter reading the question for the first time" and (2) "will not mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes." 21-A M.R.S. § 905(2). Jortner bears the burden to show that the Secretary of State's inclusion of the term causes the question to violate one or both of the two section 905(2) criteria. *See Olson*, 1997 ME 30, ¶ 7, 689 A.2d 605; *see also* 21-A M.R.S. § 905(2); *Maquoit Bay, LLC*, 2022 ME 19, ¶ 5, 271 A.3d 1183.

### 1. The New Company as Classified and Described in the Proposed Legislation

[¶17] "The electric power industry is generally made up of three types of electric utilities: investor-owned utilities, publicly owned utilities (including federal, state and municipal governmental entities) and electric cooperatives." 16 *Business Organizations with Tax Planning* § 240E.01 (Matthew Bender Lexis 2023). According to the Maine Public Utilities Commission's summary of residential electric rates, Maine's electric utilities consist of all three types— although they are currently classified in statute as either "consumer-owned" or "investor-owned." *See* Me. Pub. Utils. Comm'n, *Residential Electric Rates*, *available at* https://perma.cc/6QYF-XGQ9; 35-A M.R.S. §§ 3104(1)(A), 3201(6), 3501(1) (2023).

[¶18] The proposed legislation would classify the Company as a "consumer-owned transmission and distribution utility" for purposes of the Maine statutes governing public utilities. *See* Pine Tree Power Petition, §§ 9, 12 (proposed 35-A M.R.S. §§ 3501(1)(F), 4003(1), (12)(A)). An existing statute defines "consumer-owned transmission and distribution utility" to mean "any transmission and distribution utility that is wholly owned by its consumers,

including its consumers served in the State."[2]  35-A M.R.S. § 3501(1).  The current statutory "consumer-owned transmission and distribution utility" category explicitly includes five identified types of entities: a "rural electrification cooperative," an "electrification cooperative organized on a cooperative plan under the laws of the State," a "municipal or quasi-municipal transmission and distribution utility located in the State," "[t]he portion of any municipal or quasi-municipal entity located in the State providing transmission and distribution services," and a "transmission and distribution utility wholly owned by a municipality located in the State."[3]  35-A M.R.S. § 3501(1)(A)-(E).

[¶19]  That the statutory "consumer-owned" category already includes five different types of electric utilities raises an immediate question as to how the ballot question should describe the Company.  The proposed legislation does not answer the question because it would simply include the Company by

---

[2] Notably, an "investor-owned transmission and distribution utility" is defined in the negative, for purposes of the statute governing scheduled meter readings, as "a transmission and distribution utility other than a consumer-owned transmission and distribution utility as defined in [35-A M.R.S. § 3201 (2023)]."  35-A M.R.S. § 3104(1)(A) (2023).  Section 3201(6) provides the same definition of a "consumer-owned transmission and distribution utility" as 35-A M.R.S. § 3501(1) (2023).

[3] The Maine statute is not alone in classifying publicly owned utilities with member-owned cooperatives under the "consumer-owned" rubric.  *See, e.g., Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1072 (Wash. 1987) ("[T]he rural electric cooperatives, like the respondent [public utility districts] and municipal utilities, are nonprofit, consumer-owned utilities serving those who reside within their service areas . . . .").  Other authorities distinguish between publicly owned and consumer-owned utilities.  *See Town of Concord v. Bos. Edison Co.*, 915 F.2d 17, 19-20 (1st Cir. 1990) ("Investor-owned utilities of the type we have described supply approximately 75% of the nation's electricity.  The remainder is supplied by government- and consumer-owned systems.").

name as a sixth type of utility within the statutory "consumer-owned" category without stating what type it is or how it resembles or differs from the five utility types already included in the statute. *See* Pine Tree Power Petition, § 9 (proposed 35-A M.R.S. § 3501(1)(F)).

[¶20] The Company would not be a cooperative because the proposed legislation does not contain any provision conferring any ownership or property interest or right on the Company's customers that would be comparable to the property rights of members of a cooperative.[4] Indeed, the proposed legislation defines a "customer-owner" only as "a person to whom the company provides electricity." *Id.* § 12 (proposed 35-A M.R.S. § 4001(5)). Consistent with the Company's designation in the title of the proposed Act as a "nonprofit" utility, the proposed legislation provides that "[t]he rates and all other charges of the company must be sufficient to pay in full the cost of service, including the cost of debt and property taxation," *id.* § 12 (proposed 35-A M.R.S.

---

[4] For example, by statute, the users of a rural electric cooperative's transmission and distribution services are "members" of the cooperative, 35-A M.R.S. § 3734 (2023), and are granted specific statutory rights to receive portions of the cooperative's revenue and value, 35-A M.R.S. §§ 3705, 3755(5) (2023). A rural electrification cooperative must, in specified circumstances, distribute revenues in the form of prorated "patronage refunds" to its members (who must be users of the cooperative's transmission and distribution services), *id.* §§ 3705, 3734, and must similarly distribute funds to members proportionally and through a prescribed method if it dissolves and winds up its business, *id.* § 3755(5). There are no comparable provisions in the proposed legislation here.

§ 4004), with no provision for refunds, rebates, dividends, or similar distributions to customers.

[¶21]  Many aspects of the Company would be governmental in nature. Initially, the fact that the Company would be a creature of statute is itself a governmental attribute.  The following additional features lend support to the characterization of the Company as being at least partly or in a sense governmental:

- Several of the purposes of the Company further statewide policy objectives.  Those purposes include to "provide an open, supportive and competitive platform to develop and deploy renewable generation, storage, efficiency and beneficial electrification technologies"; to "assist the State in rapidly meeting or exceeding the climate action plan goals established in Title 38, chapter 3-A"; to "improve the State's Internet connectivity through more affordable access to utility poles and other infrastructure in unserved or underserved areas of the State, as defined in section 9202, subsection 5"; to "advance economic, environmental and social justice and to benefit [C]ompany workers and all communities in the State"; and to "support, secure and sustain economic growth and benefits for the State."  *Id.* § 12 (proposed 35-A M.R.S. § 4002(1)(C)-(F), (H)).

- Some members of the board of the Company would be elected by popular vote—not by customers only.  *Id.* (proposed 35-A M.R.S. § 4002(2)(A)).

- Candidates for those elected board positions would be "eligible for funding through the Maine Clean Election Act, in amounts and under terms commensurate with those for candidates for the State Senate."  *Id.* (proposed 35-A M.R.S. § 4002(2)(C)).

- "The nomination of candidates for elected members of the board [would be] governed by Title 21-A, chapter 5, subchapter 2, and the

determination of the election [would be] governed by Title 21-A, section 723-A." *Id.* (proposed 35-A M.R.S. § 4002(2)(E)).

- The Secretary of State would be authorized to "adopt rules governing the election of members of the board" in consultation with the Public Utilities Commission. *Id.* (proposed 35-A M.R.S. § 4002(2)(E)).

- A vacancy of an elected board member would be filled by a special election "held within 180 days of notification of the vacancy and declared in the manner prescribed by Title 21-A, section 366." *Id.* (proposed 35-A M.R.S. § 4002(3)).

- The board would have the obligation to make reports to the joint standing committee of the Legislature having jurisdiction over energy and utilities matters, with annual reports being required to address state climate action plan goals, job creation, and gross state product. *Id.* (proposed 35-A M.R.S. §§ 4002(7), 4011).

- The Company would be authorized to "adopt rules pursuant to Title 5, chapter 375, subchapter 2-A for establishing and administering the [C]ompany and carrying out its duties," and those rules would be "major substantive rules as defined in Title 5, chapter 375, subchapter 2-A." *See id.* (proposed 35-A M.R.S. § 4003(10)).

- Assistance and counsel could be provided to the Company's board "by the Office of the Treasurer of State, the Office of the Attorney General, the Maine Municipal Bond Bank, the Finance Authority of Maine, the [Public Utilities C]ommission, the Office of the Public Advocate and any other state entity." *Id.* (proposed 35-A M.R.S. § 4003(13)).

- The Act would refer to the Company as "a quasi-municipal corporation" for purposes of municipal debt liability, and the Company would pay municipal property taxes, but "[a]ll bonds, notes and other evidences of indebtedness issued by the [C]ompany [would be] . . . exempt from state income tax." *Id.* (proposed 35-A M.R.S. § 4008(1), (2)).

- The Act would provide that "[t]he [C]ompany serves a public purpose." *Id.* (proposed 35-A M.R.S. § 4006).

- The proceedings and records of the company would, with some exceptions, be "subject to the freedom of access laws, Title 1, chapter 13." *Id.* (proposed 35-A M.R.S. § 4010).

- The Company would have to produce a "5-year plan" that would "[e]stablish lower rates for low-income residential customers," create "rapid charging infrastructure for electric vehicles" across the state, "[r]educe make-ready and pole attachment costs for open-access fiber-optic cable in unserved and underserved areas of the State," and rapidly invest "in the distribution network to upgrade reliability and to improve capacity for interconnections of new renewable generation and storage facilities." *Id.* (proposed 35-A M.R.S. § 4012).

[¶22]   In addition, the proposed legislation provides that "[d]ebt or liability of the [C]ompany is not a general obligation or moral obligation of the State or any agency or instrumentality of the State *other than* the [C]ompany," which suggests that the Company would be an "agency or instrumentality of the State." *Id.* (proposed 35-A M.R.S. § 4005) (emphasis added).  The board of the Company would also be included among the "[g]eneral government" boards that are authorized, for their specific purposes, to "hold hearings, adopt rules and establish policies and procedures," and to "enter into contracts, establish just charges, conduct investigations, acquire property or enforce state laws." 5 M.R.S. § 12004-G; *see* Pine Tree Power Petition, § 1 (proposed 5 M.R.S. § 12004-G(36)).   Although the Company's employees would be private employees of a nongovernmental "operator" responsible for the employees' benefits, the "operator" would be selected through "competitive public

solicitation." Pine Tree Power Petition, § 12 (proposed 35-A M.R.S. § 4003(3), (5)).

[¶23] Due to the Company's substantial governmental attributes and the absence of any provision in its enabling legislation defining or conferring ownership rights in either investors or members, the Company conforms most closely to the publicly owned model of a utility.[5]  Because the term "consumer-owned," as used in the Maine utilities statutes, includes some entities that are directly and literally owned by consumers and some that are not, the Secretary of State determined that the term "consumer-owned" would not be clear and understandable in context and might mislead voters who are familiar with the proposed legislation.

### 2.    "Quasi-Governmental"

[¶24] Instead of the term "consumer-owned," the Secretary of State used the term "quasi-governmental" to describe the Company because she regarded it as being similar to other "quasi-governmental" entities that have been established pursuant to Maine statutes.  This rationale assumes, however, that the informed voter is familiar not only with the proposed legislation but with

---

[5] Our characterization of the Company as being most like a publicly owned utility finds support in the parties' oral arguments.  Counsel for the Secretary of State referred to the proposed Company as a "quasi-municipal entity," and counsel for Jortner likened it to a municipal power company.

an assortment of other statutes using the term "quasi-governmental"—a term not used in the proposed legislation. Although the term "quasi-governmental" appears in several Maine statutes, it is not defined in any of them. *See, e.g.*, 21-A M.R.S. § 196-A(1)(E) (2023) (authorizing the Secretary of State or a registrar to make available, to a "quasi-governmental entity, certain voter information for that entity's authorized use only"). Some statutes give examples of quasi-governmental entities, including "a government-sponsored enterprise," 24-A M.R.S. § 1151-A(31) (2023) (defining "person" for purposes of statutes governing certain domestic life and health insurers), and "a conservation commission, a regional planning commission or a water or sewer district," 33 M.R.S. § 1581(1)(A) (2023) (defining "holder" for purposes of Maine's trail easement statutes).

[¶25] More generally, the term "quasi-governmental" itself is not a common term; it does not appear even in some unabridged dictionaries. *See, e.g.*, Webster's Third New International Dictionary of the English Language Unabridged (2002); Random House Unabridged Dictionary (2d ed. 1993). Moreover, even in legal contexts, the prefix "quasi-" "is not a very definite word." *Quasi,* Black's Law Dictionary (11th ed. 2019) (quotation marks omitted). In common usage, it has multiple meanings:

- "[t]o some degree; in some manner," *Quasi-*, American Heritage Dictionary of the English Language (5th ed. 2016);

- "being partly or almost," or "apparently but not really" having a quality, *Quasi-*, New Oxford American Dictionary (3d ed. 2010);

- "as if; in a sense or manner; . . . in part," or "seemingly" but not actually being something, *Quasi*, Webster's New World College Dictionary (5th ed. 2016); or

- "resembling, having some, but not all of the features of," *Quasi-*, Random House Unabridged Dictionary (quotation marks omitted).

[¶26] The Secretary of State's purpose in describing the Company is entirely justified, but her use of a descriptive term that does not appear in the proposed legislation and does not have a clear dictionary definition persuades us that the question as drafted is not "understandable to a reasonable voter reading the question for the first time." 21-A M.R.S. § 905(2). In marked contrast to the term at issue in *Olson*, the potentially confusing term used in the ballot question here *does not* appear in the proposed legislation. *See Olson*, 1997 ME 30, ¶¶ 2, 10-11, 689 A.2d 605 (considering whether "Class A crime," a term used in the proposed legislation, was understandable to a reasonable voter seeing the question for the first time). A voter who was aware of the proposed legislation would not necessarily have encountered the term "quasi-governmental" before reading the question. It is not reasonable to assume that a voter would have researched statutes or other sources to

determine the meaning of a term that the voter has not seen in the proposed legislation before proceeding to vote in an election.

[¶27] Even if the voter had previously encountered the term, the term is not used in the proposed legislation to describe the Company, the prefix "quasi-" has multiple meanings, and even in Maine statutes, there is no existing statutory definition of the term. For these reasons, a voter could well be uncertain about the meaning of the term in the context of the question: Is the Company in fact partly governmental or does it merely resemble a governmental entity? Or is the Company seemingly, but not actually, like a governmental entity? Although "[i]t is inevitable that ballot questions will reflect the ambiguities, complexities, and omissions in the legislation they describe," *id.* ¶ 11, a question that could generate additional ambiguity or confusion is not "understandable to a reasonable voter reading the question for the first time," 21-A M.R.S. § 905(2); *see also* Me. Const. art. IV, pt. 3, § 20; 21-A M.R.S. § 906(6)(B).

[¶28] We hold that the term "quasi-governmental" is not a term that a reasonable voter reading the question for the first time would be expected to understand in context as an adjectival descriptor of the Company. The Secretary of State's inclusion of the term in the ballot question therefore means

22

that the question does not meet the "understandable" standard of section 905(2). On the other hand, because of the Company's numerous governmental qualities and features, it would not be misleading for the question to incorporate a more understandable description of the governmental aspects of the Company,[6] but it is for the Secretary of State, not for us, to formulate the question. *See* Me. Const. art. IV, pt. 3, § 20; 21-A M.R.S. § 906(6)(B). Our application of section 905(2) in this manner furthers the legislative goal of presenting questions to the public "in a clear, concise and direct manner that describes the subject matter of the . . . direct initiative as simply as is possible." 21-A M.R.S. § 906(6)(B).

---

[6] Jortner argues that the Secretary of State's use of the term "quasi-governmental" is misleading because the voters will assume that "an organization designated as 'governmental,' regardless of qualifier, is supported by tax revenues." Existing publicly owned utilities in Maine are funded by users who pay rates, not by taxpayers, and a voter familiar with the proposed legislation would have no reason to believe that taxes would pay for the Company's delivery of electricity. *See* 35-A M.R.S. § 3912 (2023) (requiring municipal electric districts to set rates to cover "the current expenses for operating and maintaining the electric system" and to cover debt obligations); 35-A M.R.S. § 6105(2) (2023) (requiring a municipal or quasi-municipal water utility to "establish rates, tolls or charges that are just and reasonable and that provide revenue as may be required to perform its public utility service and to attract necessary capital on just and reasonable terms"); Pine Tree Power Petition, § 12 (proposed 35-A M.R.S. § 4004) (providing that "[t]he rates and all other charges of the company must be sufficient to pay in full the cost of service, including the cost of debt and property taxation"). Jortner also argues that, if the question refers to the Company as in any sense governmental, it might "trigger" an "emotional impact" among voters. The potential effect upon voters of a descriptor is not, however, within the scope of our review of a drafted question—our only task is to determine whether the question is "understandable to a reasonable voter reading the question for the first time and will not mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes." 21-A M.R.S. § 905(2).

### III. CONCLUSION

[¶29]   Ultimately, our task is not to compose the wording of a ballot question de novo but to determine whether the Secretary of State's chosen wording is "understandable to a reasonable voter reading the question for the first time" and whether it will "mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes."   21-A M.R.S. § 905(2).   Fully recognizing the considerable challenge that the Secretary of State faces in drafting a ballot question summarizing complex legislation in simple, clear, and understandable terms, we conclude that Jortner has met his burden to demonstrate that the question as drafted is not "understandable to a reasonable voter reading the question for the first time." *Id.* Even though some features of the new entity would be governmental in nature, the use of the term "quasi-governmental" in the ballot question does not meet this standard.

The entry is:

> Judgment vacating the Secretary of State's decision affirmed.   Remanded for the Superior Court to remand to the Secretary of State to revise the ballot question consistent with the analysis in this opinion.   Mandate to issue immediately.

24

STANFILL, C.J., dissenting.

[¶30]  I appreciate the Court's thorough discussion of the standards and issues involved in this case, which recognizes that the responsibility for drafting the ballot question lies with the Secretary of State.  Court's Opinion ¶¶ 3, 16; 21-A M.R.S. § 901(4) (2023).  I respectfully dissent, however, because I believe that the Secretary's use of the term "quasi-governmental" to describe the Pine Tree Power Company complies with her constitutional and statutory responsibilities to ensure that "the description of the subject matter is understandable to a reasonable voter reading the question for the first time and will not mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes," 21-A M.R.S. § 905(2) (2023); to "write the question in a clear, concise and direct manner that describes the subject matter of the . . . direct initiative as simply as is possible," 21-A M.R.S. § 906(6)(B) (2023); and to "prepare the ballots in such form as to present the question or questions concisely and intelligibly," Me. Const. art. IV, pt. 3, § 20.

[¶31] The proposed legislation does not use the term "quasi-governmental"; rather, it classifies the Company as "consumer-owned." *See* Pine Tree Power Petition, §§ 9, 12 (proposed 35-A M.R.S. §§ 3501(1)(F), 4003(1), (12)(A)).  In drafting the question, the Secretary chose to use the term

"quasi-governmental" to describe the proposed Company because she regarded it as being similar to other "quasi-governmental" entities established in Maine statutes. Court's Opinion ¶ 24. Although an informed voter may not be familiar with the term's usage in other statutes, there is no requirement that a term be defined in a statute to be understandable. And, particularly because it may be encapsulating a complex piece of legislation into one simple question, "the question need not provide complete, comprehensive information about the legislation or its effect." Court's Opinion ¶ 13.

[¶32] The Court critiques the term "quasi-governmental" as ill-defined. But it is a compound word, composed of a word and a prefix that are both readily understood. "Governmental" is simply the adjectival form of "government," and "quasi" is a commonly used prefix. As the Court explains, "quasi" can mean to some degree, in some manner, partly, apparently but not really, resembling, or seemingly but not actually. Court's Opinion ¶ 25. As both the Secretary and the Court note, many aspects of the Company are, indeed, governmental in nature. Court's Opinion ¶¶ 21-22. The Company to some degree, in some manner, almost, or partly resembles a governmental entity.

[¶33] "It is inevitable" that the phrasing of the question "reflect[s] the ambiguities, complexities, and omissions in the legislation [it] describe[s]."

*Olson v. Sec'y of State*, 1997 ME 30, ¶ 11, 689 A.2d 605. It is not our task to determine whether the Secretary's chosen phrasing is optimal; indeed, it may not be. Because I believe the question is understandable and will not mislead a reasonable voter (as previously defined), however, I would vacate the decision of the Superior Court.

---

Aaron M. Frey, Attorney General, Paul E. Suitter, Asst. Atty. Gen. (orally), and Jonathan R. Bolton, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellant Secretary of State

Sean R. Turley, Esq., and Peter L. Murray, Esq. (orally), Murray, Plumb & Murray, Portland, for appellees Wayne R. Jortner, Richard Bennett, John Clark, and Nicole Grohoski

Nolan L. Reichl, Esq. (orally), Pierce Atwood LLP, Portland, for amicus curiae Maine Affordable Energy Ballot Question Committee

Paul McDonald, Esq. (orally), and Rosalie Wennberg, Esq., Bernstein Shur, Portland, for amicus curiae Maine Energy Progress Political Action Committee

Benjamin Gaines, Esq. (orally), Gaines Law LLC, Portland, for amicus curiae The Sierra Club

Cumberland County Superior Court docket number AP-2023-7
FOR CLERK REFERENCE ONLY