MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:        2025 ME 63
Docket:          Cum-25-284
Argued:          July 8, 2025
Decided:         July 11, 2025

Panel:           STANFILL, C.J., and MEAD,* HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

ALEX TITCOMB et al.

v.

SECRETARY OF STATE et al.

STANFILL, C.J.

[¶1]  Alex Titcomb and four other registered Maine voters[1] (collectively, Titcomb) appeal from a judgment entered by the Superior Court (Cumberland County, *O'Neil, J.*) affirming the Secretary of State's determination of the wording of a ballot question for citizen-initiated legislation that would amend Maine voting laws.  Titcomb argues that the wording of the question does not meet the statutory requirements that it be "understandable to a reasonable voter reading the question for the first time and . . . not mislead a reasonable

---

\*  Although not available at oral argument, Justice Mead participated in the development of this opinion. *See* M.R. App. P. 12(a)(2) ("A qualified Justice may participate in a decision even though not present at oral argument.").

[1]  The four other voters are Heather Sirocki, Kevin Murphy, George Colby, and Randall Adam Greenwood.

voter who understands the proposed legislation into voting contrary to that voter's wishes," 21-A M.R.S. § 905(2) (2025), and that it be written "in a clear, concise and direct manner that describes the subject matter of the . . . direct initiative as simply as is possible," 21-A M.R.S. § 906(6)(B) (2025).  Having reviewed the Secretary's decision independently, we affirm the judgment of the Superior Court.

## I.  BACKGROUND

[¶2]  In February 2024, Titcomb applied to the Secretary for approval to circulate a petition for a citizen initiative proposing legislation that would amend election laws.  *See* 21-A M.R.S. § 901 (2025); Me. Const. art. IV, pt. 3, § 18, cl. 1.  After the Secretary of State revised and approved the form of the petition, Titcomb circulated the petition and filed the signed petition forms with the Secretary on January 6, 2025.  *See* 21-A M.R.S. §§ 901, 901-A, 902, 903, 903-A (2025); Me. Const. art. IV, pt. 3, § 18, cls. 1, 2.  In February 2025, the Secretary certified that the initiators of the legislation had obtained sufficient valid signatures on the petition.  *See* 21-A M.R.S. § 905(1) (2025); Me. Const. art. IV, pt. 3, § 18, cls. 1, 2.

[¶3]  On March 12, 2025, the Secretary released a proposed ballot question for public comment for the requisite thirty-day period.  *See* 21-A M.R.S. §§ 901(4), 905-A, 906(6).  That proposed question read as follows:

> Do you want to change Maine election laws to require voters to show ID before voting, end ongoing absentee voting for seniors and people with disabilities, ban prepaid postage on absentee ballot return envelopes, prohibit requests for absentee ballots by phone or family members, eliminate two days of absentee voting, and make other changes to our elections?

[¶4]  Meanwhile, the Legislature considered legislation to enact the content of the initiative, "An Act to Require an Individual to Present Photographic Identification for the Purpose of Voting," L.D. 1149 (132d Legis. 2025), but did not act on it.  *See* Me. Const. art. IV, pt. 3, § 18, cls. 1, 2.

[¶5]  The public comment period on the proposed ballot question closed on April 11, 2025.  After consideration of the 318 comments she received, on May 5, 2025, the Secretary decided on the final wording for the ballot question as required by 21-A M.R.S. § 905-A:

> Do you want to change Maine election laws to eliminate two days of absentee voting, prohibit requests for absentee ballots by phone or family members, end ongoing absentee voter status for seniors and people with disabilities, ban prepaid postage on absentee ballot return envelopes, limit the number of drop boxes, require voters to show certain photo ID before voting, and make other changes to our elections?

[¶6]  On May 14, 2025, Titcomb filed in the Superior Court a timely petition for judicial review of the Secretary's decision.  *See* 21-A M.R.S. §§ 901(7), 905(2); M.R. Civ. P. 80C.  The court granted a motion to intervene filed by Victoria Kornfield, Lisa Buck, DSCC (Democratic Senatorial Campaign

4

Committee), DCCC (Democratic Congressional Campaign Committee), and the Democratic Governors Association.

[¶7] Titcomb argued to the court that the drafted question was misleading because it improperly singled out the proposal's effect on the ongoing absentee voter status of seniors and people with disabilities when a recent amendment made that status available to any voter effective December 31, 2025. *See* P.L. 2023, ch. 404, §§ 1, 2 (to be codified at 21-A M.R.S. § 753-A(8)). He further argued that the question was not understandable to the average voter because it used the confusing technical term "ongoing absentee voter status" and used vague language in the final catch-all phrase "other changes to our elections." He argued that the question failed to represent the proposal's subject matter accurately and was not sufficiently concise.

[¶8] The court considered these arguments and those of the Secretary and issued a decision on June 13, 2025, affirming the Secretary's decision. The Superior Court concluded that the language of the question was understandable and not misleading.[2] Titcomb timely appealed. *See* 21-A M.R.S.

---

[2] The Secretary argued to the Superior Court, and to us, that Titcomb waived any objection to the Secretary's formulation of the question because he did not object during the public comment period. *See New England Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife*, 550 A.2d 56, 58-61 (Me. 1988). The Superior Court opted not to address the issue, nor do we find it necessary to do so given our holding.

§ 905(3). We issued an expedited briefing schedule and received briefs from the parties; the intervenors; and amici curiae League of Women Voters of Maine, Disability Rights Maine, Legal Services for Maine Elders, and political science professors Amy Fried, David Kimball, Carrie LeVan, and Daniel Smith. We then heard oral arguments from the parties and intervenors.

## II. DISCUSSION

[¶9] We begin with a summary of our standard of review, the relevant constitutional and statutory provisions, and our precedent interpreting the law governing the Secretary's drafting. We then proceed to an analysis of the issues presented.

### A.    Standard of Review and Pertinent Law

[¶10] Our "standard of review must be the same as for the Superior Court." 21-A M.R.S. § 905(3). Thus, we review the Secretary's wording of the ballot question directly to "determine whether the description of the subject matter is understandable to a reasonable voter reading the question for the first time and will not mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes." *Id.* § 905(2); *see Jortner v. Sec'y of State*, 2023 ME 25, ¶ 8, 293 A.3d 405; *Olson v. Sec'y of State*, 1997 ME 30, ¶ 4, 689 A.2d 605. "This standard of review subsumes our review of whether the Secretary of State met her constitutional obligation to 'prepare the

6

ballots in such form as to present the question or questions concisely and intelligibly,' Me. Const. art. IV, pt. 3, § 20, and her statutory obligation to 'write the question in a clear, concise and direct manner that describes the subject matter of the . . . direct initiative as simply as is possible,' 21-A M.R.S. § 906(6)(B)." *Jortner*, 2023 ME 25, ¶ 8, 293 A.3d 405. The burden of persuasion rests with the party challenging the Secretary's action. *See id.*

[¶11] The constitutional and statutory requirements for ballot questions on initiated legislation are "designed to ensure that voters, who may be reading the *question* for the first time in the voting booth, will understand the subject matter and the choice presented." *Id.* ¶ 12 (quotation marks omitted). Voters are not expected to "rely on the ballot question alone in order to understand the proposal," however, because voters are presumed to have "discharged their civic duty to educate themselves about the initiative" before reading the question. *Id.* ¶¶ 11-12 (quotation marks omitted).

[¶12] Section 905 does not require "that the description be understandable to a voter who is reading both the question *and the legislation* for the first time." *Id.* (quotation marks omitted). The statute requires us to ask whether "a reasonable voter *who understands the proposed legislation*" would be unable to understand the question or misled into voting contrary to that voter's wishes when reading the question for the first time. *Id.* ¶ 13 (quotation

marks omitted); *see* 21-A M.R.S. § 905(2). We are not deciding "whether a voter who does not understand the proposed legislation would be able to fully understand it based on the question alone." *Jortner*, 2023 ME 25, ¶ 13, 293 A.3d 405.

[¶13] The Secretary's drafted question also "need not provide complete, comprehensive information about the legislation or its effect." *Id.* "Merely demonstrating that the question creates a misleading impression about the legislation is not enough" to justify our rejection of the wording. *Olson*, 1997 ME 30, ¶ 7, 689 A.2d 605. We consider whether a reasonable, informed voter would either misunderstand what the ballot question is asking about the proposed legislation or be misled into voting against the voter's intent. *See* 21-A M.R.S. § 905(2); *Jortner*, 2023 ME 25, ¶ 14, 293 A.3d 405; *Olson*, 1997 ME 30, ¶ 9, 689 A.2d 605; *Wagner v. Sec'y of State*, 663 A.2d 564, 568 (Me. 1995).

[¶14] In short, the statute creates guardrails around the Secretary's discretion in formulating the ballot question. Within those guardrails, the Secretary has broad flexibility in how she drafts the question, and we do not constrain that flexibility. We review only whether the Secretary strayed beyond the guardrails created by statute by formulating the question in a way that either is not understandable or is misleading. 21-A M.R.S. § 905(2).

8

**B.** **Review of the Ballot Question**

[¶15]  The proposed legislation at issue here is entitled "An Act to Require an Individual to Present Photographic Identification for the Purpose of Voting," L.D. 1149, but it addresses much more than photographic identification.  It contains twenty-seven amendments affecting multiple aspects of Maine election law, some of which are not related to photographic identification.  The summary for the legislation hints at its scope:

> This initiated bill requires the presentation of photographic identification for in-person and absentee voting.  Acceptable forms of photographic identification include an unexpired Maine driver's license, nondriver identification card, interim identification form issued by the Secretary of State, United States passport or United States passport card, United States military identification card, Maine National Guard identification card and United States Department of Veterans Affairs identification card.  The bill directs the Secretary of State to provide free nondriver identification cards for photographic identification.  The bill allows voters without photographic identification to complete a challenged ballot and within 4 days after the date of the election appear before the registrar of voters and present photographic identification.  The bill also provides an exception for voters with religious objections to being photographed.  The bill removes provisions of law that allow voters to make telephone applications for absentee ballots and that allow voters to automatically receive absentee ballots for each election without submitting a separate request for each election.  It also provides that a municipality may have only one secured drop box for the return of absentee ballots.

The Secretary provided a comprehensive summary of the initiated legislation in her decision:

Among other things, the Act would: (1) require people voting in-person in Maine elections to show one of several forms of government-issued photo identification; (2) require elections officials to challenge the ballot of any voter unable to show the proper ID; (3) bar such challenged ballots from being counted unless the voter presents photo identification to the registrar within 4 days of the election; (4) limit municipalities to using a single drop box for absentee ballots; (5) require the clerk to ensure that the two-person team servicing the drop box is bipartisan, (6) substantially rewrite the provision governing the process for requesting an absentee ballot to eliminate the ability of a family member to request a ballot and to require voters to provide additional information on the application; (7) eliminate the right to request an absentee ballot by telephone; (8) eliminate the last two days of the no-excuse absentee voting period; (9) eliminate the right of individuals who are over 65 or disabled to request ongoing absentee voter status, where they are automatically sent an absentee ballot before each election; (10) require absentee voters to fill out an "identification envelope" to be provided with the absentee ballot, which must include a driver's license or nondriver identification card number or a photocopy of the voter's photographic identification, the voter's date of birth, the type and date of the election in which they are voting, and other information; (11) prohibit public offices, officials, and employees from prepaying return postage for an absentee ballot; (10) prohibit election officials from preprinting any responses required by the newly required identification envelope; (12) eliminate the ability of family members to return a voter's absentee ballot by mail; (13) prohibit municipalities from allowing absentee ballots to be returned to more than one municipal office; and (14) repeal the procedures governing voting when a ballot is delivered or returned by a 3rd person.

[¶16] Presented with initiated legislation proposing these various amendments to Maine election laws, the Secretary decided to list the six most significant changes and indicate that the list was not exhaustive. She

determined the order for listing the proposed amendments by prioritizing the changes to absentee voting procedures, which she found "are more extensive and wide-ranging than its changes to in-person voting procedures." She opted to refer to "certain photo ID" instead of using the generic "ID" because the definition of "photographic identification" in the proposed legislation is limited.[3] L.D. 1149, § 4. She also clarified the term "ongoing absentee voting" in reference to seniors and people with disabilities by using the statutory language that the initiated legislation seeks to repeal: "ongoing absentee voter status." 21-A M.R.S. § 753-A(8).

[¶17] We review whether (1) the drafted question is misleading because it improperly singles out the proposed legislation's effect on seniors and people with disabilities when a recent amendment will, when it takes effect, make "ongoing absentee voter status" available to all voters and (2) the question is understandable to a reasonable voter despite the use of the terms "ongoing absentee voter status," "certain photo identification," and "other changes to our elections," and despite the changed ordering of the listed proposed amendments.

---

[3] Significantly, it is narrower than the forms of identification currently accepted in verifying the identity of an applicant who is registering to vote. *See* 21-A M.R.S. § 112-A (2025); L.D. 1149, § 4 (132d Legis. 2025).

**1.    Whether the Question is Misleading in Referring Specifically to Seniors and People with Disabilities**

[¶18] Titcomb argues that the Secretary's question is misleading because it indicates that the proposed legislation, which would repeal 21-A M.R.S. § 753-A(8), targets seniors and people with disabilities.  The statute currently in effect, which will still be in effect at the time of the vote on the initiated question, authorizes "[a] voter who will be at least 65 years of age by the next election or who self-identifies as having a disability to apply for status as an ongoing absentee voter."  *Id.*  Effective December 31, 2025, however, *any* voter may apply for ongoing absentee voter status.  P.L. 2023, ch. 404, §§ 1, 2 (codified under the December 31, 2025, effective date at 21-A M.R.S. § 753-A(8) (2025)).

[¶19]  The phrase indicating that the proposed legislation would "end ongoing absentee voter status for seniors and people with disabilities" is accurate.  They are the only groups whose "ongoing absentee voter status" will be ended by the proposed legislation.  That the Secretary did not indicate that the proposal would have a broader effect beginning on December 31, 2025, does not make the question she drafted inaccurate or misleading, particularly given that we assume that a voter is a reasonable, informed voter who understands the proposed legislation, which references P.L. 2023, ch. 404—the legislation authorizing any voter to seek ongoing absentee voter status.  *See* L.D.

12

1149, § 19; 21-A M.R.S. § 905(2); *Jortner*, 2023 ME 25, ¶ 14, 293 A.3d 405; *Olson*, 1997 ME 30, ¶ 9, 689 A.2d 605; *Wagner*, 663 A.2d at 568.

[¶20]  Moreover, a misrepresentation in a ballot question is not necessarily sufficient to invalidate the question.  *See Wagner*, 663 A.2d at 568. Section 905(2) demands more: a ballot question is fatally misleading only if a voter would be led to vote contrary to the voter's intent.  *See id.*  In one case, we concluded that the use of the term "putting" in the following question was not misleading: "Should spraying pesticides from the air or putting pesticides in Maine's waters be a Class A crime?"  *Olson*, 1997 ME 30, ¶¶ 3, 7-9, 689 A.2d 605 (quotation marks omitted).  We reached this conclusion because the meaning of "putting" was similar to what was proposed in the act, which criminalized "caus[ing], by any means, the introduction of" pesticides in Maine waters. *Olson*, 1997 ME 30, ¶¶ 7-9, 689 A.2d 605 (quotation marks omitted).  The drafted question said nothing about a state-of-mind requirement, and we concluded that the word "putting" would not mislead a voter familiar with the initiative into thinking that the statute would prohibit only intentional conduct. *Id.* ¶¶ 8-9.

[¶21]  Here, a reasonable, informed voter familiar with the proposed legislation will be aware of P.L. 2023, ch. 404, which the proposal explicitly references in connection with the proposed repeal of section 753-A(8).  *See* L.D.

1149, § 19. Although the Secretary could have chosen different language, the language of the question is not misleading.

### 2. Whether Language in the Question is Not Understandable to a Reasonable Voter

[¶22] Titcomb argues that the question is not understandable because it does not accurately present the legislation's primary purpose of requiring voters to present identification. We disagree. The Secretary's listing of the absentee voting provisions first is consistent with her assessment that the proposed changes to absentee voting are the most extensive changes to existing law. *See* L.D. 1149. Several public comments emphasized the importance of conveying the full scope of the proposal to voters, particularly as it affects absentee voting. The Secretary's question accurately identifies the legislation to voters by summarizing its contents to "ensure that voters, who may be reading the question for the first time in the voting booth, will understand the subject matter and the choice presented." *Jortner*, 2023 ME 25, ¶ 12, 293 A.3d 405 (emphasis omitted). We assume that a voter reads the whole question, and we disagree that the Secretary's ordering of the accurate summaries of the proposed amendments makes the question not understandable.[4]

---

[4] The title of the proposed act does not control the Secretary's assessment of the act's primary purpose. *Cf. Denutte v. U.S. Bank, N.A.*, 2019 ME 124, ¶ 18 n.7, 213 A.3d 619 ("[A] heading is not part

14

[¶23]   Titcomb next contends that the average voter would not understand from the drafted question what the term "ongoing absentee voter status" means, what "certain photo identification" means, and what "other changes to our elections" would include.

[¶24]   We disagree with Titcomb that the Secretary's reference to "ongoing absentee voter status" is confusing.   The Secretary used specific statutory language from the title of the Maine Revised Statutes that the initiated legislation aims to amend—a practice we approved in *Olson*, 1997 ME 30, ¶¶ 10-11, 689 A.2d 605 (holding that the term "Class A crime," when viewed with existing statutes in Title 17-A, was understandable to reasonable voters who discharged the civic duty to educate themselves).   Here, the language is even more precisely tailored than in *Olson* because the language is drawn directly from the subsection that the initiated legislation would repeal.   *See* 21-A M.R.S. § 753-A(8).

[¶25]   Moreover, unlike in *Jortner*, where we held that the term "quasi-governmental" lacked a commonly understood meaning, 2023 ME 25, ¶ 25, 293 A.3d 405, the term "ongoing" commonly means "continuing,"

of the legal provision for purposes of our statutory construction analysis.").  The Secretary properly looked to the content of the proposed act itself to determine the order in which to list the summaries of the proposed amendments.  *See id.*

*Ongoing*, New Oxford American Dictionary (3d ed. 2010), which plainly and accurately conveys to a voter that having "ongoing absentee voter status" would establish continuing status as an absentee voter. *See* 21-A M.R.S. § 753-A(8).

[¶26] The use of the term "certain photo identification" is similarly understandable to a reasonable, informed voter. The use of the term "certain" makes clear to a voter that not all forms of photo identification would satisfy the voting procedure statute, 21-A M.R.S. § 671 (2025), as it is proposed to be amended. *See* L.D. 1149, § 4. The proposed legislation would require a voter to display "photographic identification" and defines that term to include only certain forms of identification, excluding other common forms of identification that satisfy voter registration requirements. *See* 21-A M.R.S. § 112-A (2025); L.D. 1149, §§ 1, 4. A reasonable, informed voter familiar with the proposal will not find the question confusing.

[¶27] Nor are we persuaded that the catchall language at the end of the question undermines a voter's understanding of the question. Indeed, a failure to include such an indication could lead to voter confusion because the proposed legislation includes amendments beyond those explicitly summarized in the question. In essence, the final portion of the question reflects the reality that, given the requirement that the question be concise, it

16

cannot enumerate all changes proposed in the initiative. The question viewed in its entirety is sufficiently clear that a voter familiar with the proposed legislation will know how to mark the ballot to indicate the voter's intent.

[¶28] Titcomb also argues, citing section 906(6)(B), that the question is not concise and understandable because it is longer than questions presented to the public in earlier elections. As we have stated in other contexts, however, the requirement of conciseness is subsumed in our standard of review set forth in section 905(2). *See Jortner*, 2023 ME 25, ¶ 8, 293 A.3d 405; *Olson*, 1997 ME 30, ¶ 6, 689 A.2d 605. The length of the question matters only if it prevents a reasonable, informed voter from understanding the question. Here, the question is certainly longer than many other questions placed on the ballot in Maine. *See* Maine State Legislature, *Citizen Initiated Legislation, 1911-Present*, https://www.maine.gov/legis/lawlib/lldl/citizeninitiated/ [https://perma.cc /L3NN-VP7E] (listing initiated legislation through 2024). Nonetheless, we conclude that given the many disparate provisions in the proposed legislation, the length of the Secretary's question listing the proposed statutory changes does not render the question incomprehensible or misleading. Although initiated legislation may contain a variety of provisions with different purposes, it is subject to a single yes-or-no vote. *See Caiazzo v. Sec'y of State*, 2021 ME 42, ¶¶ 24, 27, 256 A.3d 260. It is appropriate for the Secretary to list phrases

describing the various proposed changes in a single ballot question. *Id.* Here, although the question is longer than most have been in the past, that is because it lists the salient features of the legislation in short, easily understood phrases. The wording may be complex, but it is not complicated.[5]

[¶29]    Because we conclude that the Secretary's question "is understandable to a reasonable voter reading the question for the first time and will not mislead a reasonable voter who understands the proposed legislation into voting contrary to that voter's wishes," 21-A M.R.S. § 905(2), we affirm the judgment of the Superior Court.

The entry is:

> Judgment affirmed.

---

Patrick Strawbridge, Esq. (orally), and Brandon Haase, Esq., Consovoy McCarthy PLLC, Boston, Massachusetts, and Benjamin E. Hartwell, Esq., Steve Smith Trial Lawyers, Augusta, for appellants Alex Titcomb, Heather Sirocki, Kevin Murphy, George Colby, and Randall Adam Greenwood

Aaron M. Frey, Attorney General, Jonathan Bolton, Asst. Atty. Gen. (orally), and Paul E. Suitter, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Secretary of State

---

[5] "Complex" means "[c]onsisting of interconnected or interwoven parts; composite," *Complex*, American Heritage Dictionary of the English Language (5th ed. 2016), as distinguished from "complicated," which means "[n]ot easy to understand or analyze because of being intricate," *Complicated*, American Heritage Dictionary of the English Language.

Aria C. Branch, Esq., Christopher D. Dodge, Esq. (orally), and Omeed Alerasool, Esq., Elias Law Group LLP, Washington, District of Columbia, and James G. Monteleone, Esq., and Katherine R. Knox, Esq., Bernstein Shur, Portland, for appellees Victoria Kornfield, Lisa Buck, DSCC, DCCC, and the Democratic Governors Association

Peter Rice, Esq., and Lauren Wille, Esq., Disability Rights Maine, Augusta, and Benjamin Jenkins, Esq., Legal Services for Maine Elders, Augusta, for amici curiae Disability Rights Maine and Legal Services for Maine Elders

Matthew P. Schaefer, Esq., SchaefferLaw LLC, Portland, for amicus curiae League of Women Voters of Maine

Benjamin Gaines, Esq., Gaines Law, LLC, Brunswick, for amici curiae Amy Fried, David Kimball, Carrie LeVan, and Daniel Smith

Cumberland County Superior Court docket number AP-2025-15
FOR CLERK REFERENCE ONLY